UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

WELDON L. MOSBY,

                    Petitioner,                          Case No. 5:05-cv-61

v.                                         Honorable Richard Alan Enslen

SHARON L. BURT,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving concurrent terms of life imprisonment and 40 to 60 years' imprisonment, imposed by the Montcalm County Circuit Court on October 13, 2000, after a jury convicted Petitioner on one count each of first-degree murder, MICH. COMP. LAWS § 750.316, and conspiracy to commit murder, MICH. COMP. LAWS §§ 750.157a(a) and 750.316.  In his *pro se* petition, Petitioner raises eight grounds for habeas relief, as follows:

I.        Petitioner's Sixth Amendment right to effective assistance of counsel was violated by appellate counsel's (1) failure to recognize and file an obvious issue on appeal, i.e., that Petitioner's rights to confrontation and due process were violated, when this issue was preserved in Petitioner's preliminary record; (2) failure to file an obvious claim of ineffective assistance of trial counsel for trial counsel's failure to seek interlocutory appeal from this preserved issue; and (3) failure to represent Petitioner as ordered by the court.

II.       Petitioner's state and Sixth Amendment right to effective assistance of counsel was violated by (1) preliminary examination counsel's failure to file an immediate interlocutory appeal from the court's admission of a prosecution witness's improper testimony; and (2) trial counsel's failure to call two key witnesses.

III.   Petitioner's right to due process of law was violated by his defective indictment and information, which failed to give adequate notice of the charges against him and an opportunity to be heard.

IV.   Petitioner's right to an impartial jury was violated when the trial court denied Petitioner's motion for a change of venue.

V.    The trial court erred when it denied Petitioner's motion to suppress his statement to police, when the circumstances surrounding the statement show it was not made voluntarily.

VI.   The trial court abused its discretion in denying Petitioner's motion to quash the information based on an improper bind-over resulting from incredible and incompetent evidence presented at the preliminary examination.

VII.  Petitioner's rights to effective assistance of counsel, due process, and a fair trial were violated when the trial court allowed the prosecution to introduce, over Petitioner's objection, DNA lab reports suggesting the victim's blood was found on an ax that had been linked to Petitioner, because the lab reports were not provided to Petitioner in a timely fashion.

VIII. Petitioner's state and federal right to effective assistance of counsel was violated when his trial counsel opened the door during closing argument for the prosecutor to infer [sic] in rebuttal argument that two non-testifying witnesses had invoked their Fifth Amendment privilege not to testify.

Respondent filed an answer to the petition (docket #9) arguing that the grounds should be denied.

Upon review and applying the AEDPA standards, I find that Grounds One, Two, and Three are

procedurally barred; and grounds Four through Eight are without merit.  Accordingly, I recommend

that the petition be denied.

**Procedural History**

**A.  Trial Court Proceedings**

The state prosecution arose from the December 1999 ax murder of Howard Ringleka

in Stanton, Michigan.  Petitioner was charged with one count each of first-degree premeditated

murder, conspiracy to commit first-degree premeditated murder, and solicitation to commit first-

degree premeditated murder.  Following a preliminary examination on February 2, 2000, he was bound over on the first-degree murder and conspiracy charges.   Petitioner was tried before a jury beginning September 11, 2000 and concluding on September 13, 2000.

On April 13, 2000, Petitioner's first court-appointed trial attorney moved to withdraw due to a breakdown of the attorney-client relationship.  (4/13/00 Mot. Tr., 3, docket #13.)  The trial court granted the motion and appointed new counsel, who represented Petitioner at trial.  (*Id*. at 4.)

On July 6, 2000, Petitioner moved the court for a change of venue.  (7/6/00 Mot. Tr., docket #15.)  He based his motion on "vast pretrial publicity" in the newspaper and on television which revealed, among other things, that Petitioner was on parole at the time of the Ringleka murder and that prosecutors believed Petitioner acted alone.  (Mot. Tr. 3-5.)  Petitioner further argued that he was at a disadvantage in the small town of Stanton, because Howard Ringleka was widely known in the community as the owner of two businesses; and that there was a high probability that potential jurors would have had dealings with at least one of the 52 witnesses on the prosecution's list.  (Mot. Tr. 5-7.)  After reviewing newspaper clippings and a (presumably news) video provided by Petitioner, the court denied Petitioner's motion.  (Mot. Tr. 15-18.)  The court found that Petitioner had not met his burden of proof "to demonstrate the existence of actual prejudice or the presence of community feelings or a pattern of deep and bitter prejudice, so as to render it probable that the jurors could not set aside any preconceived notions of guilt . . . " (Mot. Tr. 15-16.)  The court's ruling was without prejudice.  (Mot. Tr. 16, 18.)

On July 18, 2000, Petitioner moved the trial court to quash the information for an improper bind-over and to suppress his confession.  (7/18/00 Mot. Tr., docket #16.)  Petitioner based his motion to quash on the alleged unreliability of the preliminary examination testimony of Carla

Ringleka and Eric McMurtry.  Petitioner argued Carla's testimony was faulty because (1) she had an incentive to testify against Petitioner, and (2) her counsel was seated directly beside her, consulting with her, throughout her testimony.  (Mot. Tr., 5-7.)  The trial court denied the motion to quash, finding no abuse of discretion by the examining magistrate judge.  (Mot. Tr., 14.)  The court noted that the examining magistrate had the benefit of being able to watch Carla Ringleka, Eric McMurtry, and all other witnesses, as they testified.  (Mot. Tr. 14-16, 28.)

Petitioner's July 18, 2000 motion to suppress was based on his allegation that his confession was involuntary.  (Mot. Tr. 29.)  Petitioner requested a hearing under *People v. Walker*, 374 Mich. 331, 132 N.W.2d 87 (1965) and *People v. Cipriano*, 431 Mich. 315, 429 N.W.2d 781 (1988) to assess the voluntariness of his confession.  (Mot. Tr. 29.)  The court conducted the hearing, at which Detective Joe Patino and Petitioner testified.  (Mot. Tr. 30-87.)  Patino testified as follows.  Petitioner was arrested on December 16, 2000 because marijuana was found in his urine at a parole office visit.  (Mot. Tr. 31.)  On December 17, Patino and his partner Lew Corwin advised Petitioner of his Miranda[1] rights around 1:00 p.m., and told him that he was a suspect in a homicide.  (Mot. Tr. 31.)  Petitioner asked to speak to his wife, Laura Mosby, a 24-year employee of the 64th District Court.  (Mot. Tr. 31, 62.)  After privately conferring with Laura for about an hour, Petitioner agreed to speak to Patino, if Laura could be present.  (Mot. Tr. 32.)  He was again Mirandized, and between 5:35 p.m. and 6:51 p.m., voluntarily gave a taped statement in which he implicated himself in the death of Howard Ringleka. (Mot. Tr. 33-35.)  Petitioner did not appear to be in pain, tired, deprived of food or drink, intoxicated, ill, or otherwise impaired when he gave the statement; nor did he tell detectives he was taking any antidepressant medication at the time.  (Mot. Tr. 37-38, 42.)  On

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

December 21, 2000, after again being advised of his Miranda rights, Petitioner gave an unrecorded statement to Patino in which he told detectives where he had dumped some property police were looking for in connection with the Ringleka murder.  (Mot. Tr. 40-42.)

At the July 18, 2000 hearing, Petitioner testified as follows.  He was arrested after buying marijuana on December 16.  (Mot. Tr. 55-56, docket #16.)  He did not recall being told he was a suspect in a homicide.  (Mot. Tr. 57.)   He did not recall being arrested and taken to jail because he was "stoned" on marijuana.  (Mot. Tr. 67-68.)  When Petitioner spoke to Laura that day, she told him to trust the detectives because they might give him an offer.  (Mot. Tr. 57.)  A doctor had prescribed Paxil for Petitioner in the fall of 1999.  (Mot, Tr. 59.)  Petitioner had Hodgkin's Disease, and had a lymph node removed from his groin on December 3, 1999; so when he was questioned on December 17th, he was uncomfortable; though he could not recall whether he'd been in pain.  (Mot. Tr. 60-61.)  Petitioner had been in prison and jail a number of times before December 1999 on charges of armed robbery, larceny, and fourth-degree criminal sexual conduct; he was therefore familiar with jail cells.  (Mot. Tr. 63-64.)  Petitioner admitted that, while the voice on the tape was his, he did not remember making the December 21 statement to police.  (Mot. Tr. 67, 75.)  Petitioner had not taken any medication that day, though he was sniffling with a cold.  (Mot. Tr. 68, 71.)  Petitioner earned his GED while in prison.  (Mot. Tr. 72.)  Petitioner was familiar with his Miranda rights in December 1999, and admitted it was his signature on the Miranda rights waiver introduced at the hearing.  (Mot. Tr. 74.)  He claimed he would not have made the statement if not for his wife telling him he might get a deal from the prosecution.  (Mot. Tr. 77.)  After hearing the testimony and reviewing admitted documents, the court denied Petitioner's motion to suppress,

finding that, under Michigan law, the prosecution had shown by a preponderance of the evidence that Petitioner's statement was voluntary.  (Mot. Tr. 87-94.)

Petitioner's trial began on September 11, 2000.  Montcalm County Deputy Sheriff Benjamin Fryc testified as follows.  Fryc and Montcalm Sheriff Deputy Sergeant Surdam were the first to arrive at the Ringleka residence around 11:00 p.m. on December 4, 1999.  (Trial Tr. vol. I, 9/11/00, 139-140, 147, docket #17.)  Carla Ringleka was standing outside and told Fryc her injured husband was inside.  (Tr. I, 139-40.)  Carla stood quietly under the eaves of the garage, with her arms crossed, showing no emotion.  (Tr. I, 150-51.)  Fryc entered the house through the garage and saw two legs sticking out of the bathroom doorway; when he approached he saw Howard Ringleka face-down on the bathroom floor.  (Tr. I, 141.)  At trial, Fryc identified as accurate depictions of the scene three photographs, one of Howard Ringleka's feet sticking out of the bathroom doorway and a teal-colored deposit bag marked with the word "Showtime" in the hallway right outside the bathroom; one of a black-handled knife sticking in the slats of the hallway closet door next to the bathroom; and one of an injured Howard Ringleka lying face-down on the bathroom floor next to the broken toilet seat.  (Tr. I, 141-42.)  The court admitted the three photographs over Petitioner's objection to the third photo.  (Tr. I, 143.)  Fryc further testified he detected no sign of life from Howard Ringleka. (Tr. I, 142.)  Montcalm County Deputy Sheriff Williams and EMS personnel then entered the house and said there was an ax in the driveway, which Fryc immediately located right in front of the garage. (Tr. I, 143-44.)  At trial, Fryc identified the ax he found in the driveway; the court admitted it into evidence.  (Tr. I, 144.)  Fryc testified that, because it was raining, Deputy Williams covered the ax with a tarp to preserve it as evidence.  (Tr. I, 144-45.)  Deputies Fryc and Williams searched the house for more victims or suspects and found nothing.  (Tr. I, 145-46.)

On cross-examination, Fryc admitted that when he first arrived at the scene, he parked next to and walked across the driveway where the ax was later found, but neither he nor Surdam saw the ax there; and that Carla Ringleka was standing outside by the garage while Fryc and Surdam were inside the house. (Tr. I, 148-49.) Fryc did not see the ax until EMS and/or Williams told him it was in the driveway. (Tr. I, 148-49.)

Montcalm County Deputy Sheriff Michael J. Williams testified as follows. When he arrived at the Ringleka residence on the night of December 4, 1999, Carla Ringleka was at the front garage door. (Tr. I, 152-53.) Along with Deputy Fryc and Sergeant Surdam, Williams observed the body of Howard Ringleka in the house. (Tr. I, 153.) The majority of the time Williams was at the house, Carla Ringleka was outside, in front of the garage. (Tr. I, 156.) When EMS personnel arrived, they told Williams there was an ax laying in the driveway. (Tr. I, 153-54, 157.) Williams went outside, saw the ax, which had blood on it, and covered it with a tarp. (Tr. I, 153-54.) At trial Williams identified as accurate depictions two photographs, one showing the ax, and one showing the ax after it had been covered with the tarp. (Tr. I, 154.) On December 5, 1999, Williams returned to the Ringleka house with a dog to search for evidence on the perimeter of the house, but found nothing. (Tr. I, 154.) Williams later assisted with Petitioner's arrest on December 16, 1999. (Tr. I, 155, 157.)

Montcalm County EMS rescue unit employee Edward Peterson testified as follows. When he approached the Ringleka residence on the night of December 4, 1999, he saw Carla Ringleka standing outside the garage area. (Tr. I, 158, 162.) When Peterson got out of his truck in the driveway, he saw an ax with a "blood-type material" on it in the driveway. (Tr. I, 159, 161.) At trial, Peterson identified as accurate a photograph of the ax. (Tr. I, 159.) Peterson pointed the ax

- 7 -

out to an officer.  (Tr. I, 159, 162.)  Peterson covered the ax with a tarp from the rescue unit, but never touched the ax.  (Tr. I, 159, 163.)  He did not touch anything in the house, nor was he ever in the area of the house where the victim lay.  (Tr. I, 159-60, 161.)

       Montcalm County paramedic Bruce Aten testified as follows.  It was raining when he and his partner Brian Brecker arrived at the Ringleka house at about 11:16 p.m. on December 4.  (Tr. I, 164.)  They did not see any people outside when they arrived.  (Tr. I, 164-65.)  Aten entered the house and, at an officer's request, verified the victim was dead by checking his back with a stethoscope and feeling his right wrist for a pulse.  (Tr. I, 165.)  Neither Aten nor any other EMS personnel touched anything else; nor did EMS remove the body.  (Tr. I, 165-67.)  Aten did not touch or see anyone else touch the ax.  (Tr. I, 167.)

       Montcalm County paramedic Michelle Lamb testified as follows.  At about 12:20 p.m. on December 5, 1999, she was dispatched to the Ringleka residence to transfer the victim's body.  (Tr. I, 169-70.)  The body was face-down in the bathroom, with its feet sticking out into the hallway.  (Tr. I, 170-71.)  Lamb worked with county detectives to identify the body, then put the body in a bag and took it to the Spectrum Health East morgue where assistant pathologist Paul Davison signed for it.  (Tr. I, 169-70.)  Montcalm County Deputy Richard Waite testified that he arrived at the Ringleka residence after Lamb had loaded the victim's body into her ambulance, and met the ambulance at the end of the driveway.  (Tr. I, 172.)  Waite followed Lamb to Spectrum and saw the body removed from the ambulance, placed on a Gurney, and passed over to the pathologist.  (Tr. I, 172-73.)

       Carla Ringleka testified as follows.  She met Petitioner and his wife in January 1999 when they were at Carla's video store, "Showtime Video" in Stanton.  (Tr. I, 175-76.)  At the time,

Carla was and had been married to Howard Ringleka for 31 years. (Tr. I, 176.) At first, Carla and Petitioner were friends, but in March 1999 Carla fell in love with Petitioner and the two were intimate. (Tr. I, 176.) They went to motels in Alma and Greenville to be together, as well as to the Ringleka residence while Howard worked third shift in Grand Rapids. (Tr. I, 176-77.) Petitioner and Howard were also friends with each other during this time. (Tr. I, 177.) At some point, Carla and Petitioner discussed the fact that the only way they could be together was if Howard wasn't around. (Tr. I, 178.) Carla did not feel she could divorce Howard because she was afraid that Howard would come after her and hurt her, as he had in the past. (Tr. I, 179.) She elaborated that, while the last ten years of the Ringlekas' marriage was "livable," prior to that period, Howard had physically hurt her. (Tr. I, 179-80.) Around October 1999, Carla and Petitioner determined they wanted to be together before or by Thanksgiving. (Tr. I, 180-81.) Petitioner first brought up the subject of killing Howard when he said he could "get two crack heads to do the job," which Carla took to mean to kill Howard. (Tr. I, 178-79.) They discussed paying the two "crack heads." (Tr. I, 187.) Petitioner told Carla that it would be done with an ax, and that it would be made to look like a robbery. (Tr. I, 180.)

Carla further testified as follows. The week before Howard was killed, Petitioner told Carla to get some sleeping pills from her doctor to make Howard permanently go to sleep. (Tr. I, 181.) Petitioner told Carla to put eight or nine of the pills into Howard's food, but Carla only used five, which just made Howard sleepy. (Tr. I, 182.) Petitioner then said he would buy some heroin, which would "put [Howard] out" so Petitioner could shoot him. (Tr. I, 182-83.) Petitioner got $150 from Carla, went to Detroit, and returned with heroin. (Tr. I, 182-83.) He told Carla to mix it into something for Howard to eat. (Tr. I, 183.) The heroin put Howard into a deep sleep; Petitioner then

- 9 -

came into the Ringleka's house with a sawed-off shotgun and told Carla to go to the other end of the house, which she did. (Tr. I, 183-84.) Petitioner came and got Carla, telling her that he could not shoot Howard while she was in the house. (Tr. I, 184.) Around this time, Howard told Carla he was going to see the doctor because he was not feeling well, which concerned Carla and Petitioner because they feared doctors' detection of the sleeping pills and heroin. (Tr. I, 185.) Petitioner noted that if Howard got shot, the drugs would "be all pumped out of him," so the two decided that December 4 or 5 would be the day they would kill Howard. (Tr. I, 185-86.)

Carla further testified that on December 4, Petitioner called Carla at the video store and told her he had found the two "crack heads" and was coming to her video store to get some money from her. (Tr. I, 186-87.) Petitioner arrived at the video store at about 10:00 p.m. and Carla gave him $400 to give "those guys" to "kill Howard." (Tr. I, 188.) Carla could not see the parking lot from the store and therefore could not determine whether anyone else was with Petitioner. (Tr. I, 187-88.) In the store, Petitioner told Carla it was going to be done with an ax. (Tr. I, 188.) Carla did not know whether there was an ax at her house or one had been brought to her house; she never saw an ax at her house on December 4 or at any other time. (Tr. I, 188.) At about 10:25 p.m. that night Carla closed the video store and went to McDonald's to get food for herself and Howard. (Tr. I, 189.) She pulled into her driveway at about 10:55 p.m. and saw headlights flashing at her as some kind of "warning," and one or two people running from the garage entrance to a car. (Tr. I, 189-90.) The flashing headlights ran the length of the vehicle, like Petitioner's headlights did. (Tr. I, 190.) After somebody got into the passenger side of the car, it quickly drove past Carla. (Tr. I, 190.) She could not see any of the people inside the car. (Tr. I, 190.)

Carla further testified that she then drove up to the house and parked in front of the garage door.  (Tr. I, 190.)  She entered her house through the garage slowly because it was unusual that the door was wide open.  (Tr. I, 190-91.)  Carla identified as accurate a photograph of the hallway that included Howard's feet sticking out of the bathroom doorway and the bag marked "Showtime" near his feet.  (Tr. I, 191.)  She did not touch Howard or the bag.  (Tr. I, 191.)  Carla called 9-1-1 and the dispatcher told her to check Howard for signs of life.  (Tr. I, 191.)  At the dispatcher's suggestion Carla went outside and called 9-1-1 from the cell phone in her truck, where she remained until police arrived.  (Tr. I, 192.)  She could not recall whether officers asked her any questions when they arrived.  (Tr. I, 192.)  Police later learned of Carla's involvement in the incident and she was charged.  (Tr. I, 192.)  In exchange for her testimony against Petitioner, Carla received a reduced charge; at the time of trial she was awaiting sentencing.  (Tr. I, 192.)

Montcalm County Deputy Sheriff Lewis Corwin testified as follows.  Corwin arrived at the Ringleka residence around 12:30 a.m. on December 5, 1999.  (Trial Tr. II, 9/12/00, 6, docket #18.)  He waited outside while the state crime lab conducted their investigation, then entered the house, and shortly thereafter found out that a video cassette recorder (VCR) and some ammunition had been stolen or removed from the Ringleka house.  (Tr. II, 6-7.)  In early 2000, corrections officers conducted two dives in a pond to search for property missing from the Ringleka house.  (Tr. II, 7-10.)  Corwin was present during the second dive in April 2000, at which time divers found the Ringlekas' missing VCR and ammunition, a cardboard box, an old television stand, and a second VCR.  (Tr. II, 7-10.)

Montcalm County Sheriff's Department Corrections Officer and dive team member Scott Bates testified as follows.  Bates conducted both dives in early 2000.  (Tr. II, 14-15.)  He found

nothing on the first dive; on the second, he found a VCR on the lake's bank underneath a television stand.  (Tr. II, 15-16, 18-19, 20-21.)  Officer Stull and Sergeant Surdam also participated in the second dive, and recovered some shotgun shells.  (Tr. II, 16-17.)  Bates found another VCR at the bottom of the lake.  (Tr. II, 17, 20.)  Detective Corwin was present on-shore during the second dive.  (Tr. II, 16, 18.)

Ralston Hardware Store owner Lynn Hethrington testified as follows.  Hethrington knew Petitioner as a frequent shopper in her small-town store and identified him in the courtroom.  (Tr. II, 22.)  In 1999, Hethrington sold three or four axes, one of which was to Petitioner.  (Tr. II, 22-23.)  At trial Hethrington authenticated an invoice for an ax Petitioner purchased on April 24, 1999.  (Tr. II, 23-28.)

Spectrum Health Pathology Assistant Paul Davison testified as follows.  When a body arrives at the Spectrum Health morgue, one of a few employees with key-card access will receive the body, enter it into a log book, check for identification, and either place the body in cold storage or prepare it for an autopsy.  (Tr. II, 28-29.)  This is standard procedure.  (Tr. II, 29-30.)  Davison could not remember whether he received the body of Howard Ringleka on December 4, 1999.  (Tr. II, 30.)

On the prosecution's unopposed motion, the court certified Montcalm County Deputy Medical Examiner James Banner, M.D. as an expert in pathology (Tr. II, 31); Banner testified as follows.  Banner was called to the Ringleka residence on December 4, 1999 to pronounce the victim dead and make arrangements for an autopsy.  (Tr. II, 32.)  Banner did not conduct the autopsy of Howard Ringleka because Spectrum Health typically conducts autopsies in suspected homicides.  (Tr. II, 32, 34.)  Banner filled out and signed Howard Ringleka's death certificate, listing "massive

cerebral cranial trauma, being struck on the head . . . multiple times by an ax . . . homicide" as the cause of death. (Tr. II, 33.) At trial, Banner authenticated the death certificate. (Tr. II, 33.)

Grand Rapids forensic pathologist Stephen Cohle, M.D., was certified by the court as an expert in forensic pathology, (Tr. II, 37), and testified as follows. On December 6, 1999, Cohle conducted the autopsy on Howard Ringleka. (Tr. II, 37.) Cohle opined that Howard Ringleka died from "multiple chop wounds of the head"; chop wounds being those caused by a heavy, sharp weapon such as an ax, hatchet, or machete. (Tr. II, 40-41.) He found the victim to have sustained at least six chop wounds to the head, and some minor wounds to the back which were likely caused by the same or a similar weapon. (Tr. II, 42-43.) One chop wound to the head would likely have been fatal. (Tr II, 43, 52.) Cohle also found an injury to the victim's face that could have been caused by the sharp or blunt parts of the same weapon; as well other sharp-force incised cuts, not characteristic of either an ax or an accidental fall, that could have been caused by a knife. (Tr. II, 43-44, 49.) The victim had cuts and bruising on his knuckles and fingers that could have been defensive wounds. (Tr. II, 45, 48.) Cohle speculated that there could have been an assault or fight before the chop wounds were inflicted. (Tr. II, 45-46.) He determined the manner of death to be homicide because the victim could not have inflicted his wounds on himself, nor were they of an accidental nature. (Tr. II, 45.) Cohle found a type of sleeping pill called Dalmane in the victim's urine. (Tr. II, 47, 48.) He stated that heroin might have stayed in the victim's system for 10 to 24 hours, depending on how much heroin was given to the victim and whether he'd ingested it with food. (Tr. II, 47.) Cohle added that heroin is broken down very quickly in the body. (Tr. I, 48.)

Bobbi Lake testified as follows. She met Petitioner at a temporary employment agency in May 1999; at trial she identified Petitioner. (Tr. II, 57-58.) Petitioner moved into Lake's

house sometime around October 28, 1999, at which time he was married.  (Tr. II, 58-59, 61.)
Petitioner and Lake were close friends, but were not romantically involved.  (Tr. II, 59.)  The two
bonded because Petitioner had cancer and Lake had diabetes.  (Tr. II, 59, 76.)  Petitioner never talked
to Lake about Carla Ringleka, but did talk about "some crazy lady."  (Tr. II, 60.)  Petitioner's counsel
objected on relevancy grounds because nothing indicated that the "crazy lady" to which Lake
referred was Carla Ringleka.  (Tr. II, 60.)  After a brief sidebar, the prosecutor moved to a different
line of questioning.  (Tr. II, 60.)  Lake further testified that Petitioner kept odd hours, coming home
after work and then going out again at night.  (Tr. II, 61.)  Lake and Petitioner traveled together to
Detroit around November 30, 1999.  (Tr. II, 61-62.)  In Detroit, Petitioner left Lake in the car and
went down an alley, then returned to the car with some heroin and asked Lake to put it in a black
film container, which Lake did.  (Tr. II, 62-63.)  They then returned home; neither Petitioner nor
Lake used the heroin.  (Tr. II, 63.)  The cannister of heroin never came into the house; the last place
Lake saw it was in the car.  (Tr. II, 63.)  That night, Petitioner went out.  (Tr. II, 63-64.)  About a
week later, Lake drove the car and did not see the black cannister in the car.  (Tr. II, 64, 65.)  Lake
did not know to whom, if anyone, Petitioner gave the heroin.  (Tr. II, 64.)

              Bobbi Lake further testified that Petitioner was seeing a number of women when he
was living with her, but she did not know their names.  (Tr. II, 64.)  After his car broke down on
December 5, 1999, Petitioner was home nights instead of going out.  (Tr. II, 65.)  On December 5,
1999, Petitioner brought a black garbage bag home with him.  (Tr. II, 66.)  He showed Lake a few
items from the bag, including a case that contained what he thought were binoculars but was in fact
a camera, and a case containing ammunition for hunting.  (Tr. II, 66.)  Petitioner also told Lake that
one VCR was in the bag.  (Tr. II, 68-69.)  He told Lake the bag of items came from a robbery a

- 14 -

couple of guys committed in Detroit.  (Tr. II, 67.)  On December 5, 1999, Lake accompanied Petitioner to a lake where Petitioner then dumped the bag.  (Tr. II, 67, 71.)  She told police about the lake, pointed it out to them, and accompanied them to the lake.  (Tr. II, 68.)  On December 5, 1999, Petitioner's wife dropped him off at Lake's house; Petitioner told Lake that his car had broken down somewhere near Lansing.  (Tr. II, 69.)  On December 6, Lake went with Petitioner to his broken-down car.  (Tr. II, 70.)  Petitioner asked Lake to wipe everything down in the back seat with Pine Sol and rags, which Lake found odd, and did not do.  (Tr. II, 70-71, 73.)  Sometime after the car was back at Lake's house, Petitioner cleaned all of the carpets in the car.  (Tr. II, 73.)

Bobbi Lake further testified that she saw Petitioner bring an ax into her house around November 1999.  (Tr. II, 72.)  After December 4, 1999, Lake no longer saw the ax in her house. (Tr. II, 72-73.)  Sometime around December 7, 1999, Petitioner told Lake a friend of his had died from being hit in the head multiple times with an ax.  (Tr. II, 74.)  Only later did Lake find out that the friend was Howard Ringleka.  (Tr. II, 74, 56.)  When Lake asked Petitioner whether he'd killed his friend, Petitioner responded, "Why I don't know, do you think I should have to kill you?" (Tr. II, 75.)  Petitioner often acted like he did not want to tell Lake his business because he couldn't trust her.  (Tr. II, 75.)  When the prosecutor moved for admission of the black garbage bag into evidence, Petitioner objected because Lake had only seen two items from the bag.  The court admitted only a small plastic baggie of ammunition from the garbage bag.  (Tr. II, 75-76.)

On cross-examination Lake testified as follows.  Petitioner's cancer recurred when he was living with Lake sometime prior to Thanksgiving 1999.  (Tr. II,. 76.)  He had outpatient surgery on the lump on December 3, 1999; that night he stayed with his wife.  (Tr. II, 77, 81.)  After his December 3 surgery, Petitioner was sore, home more often, less active, and was taking Vicodin

and the antidepressant Paxil.  (Tr. II, 77-78, 82.)  Lake saw Petitioner at her house on December 4 around 2:30 p.m. for about 20 minutes, at which time he appeared to be in pain and was walking slowly.  (Tr. II, 81, 82.)  Lake did not see Petitioner again until December 5 at around 3:00 p.m., when he and his wife stopped by Lake's house briefly and Petitioner dropped off the black garbage bag.  (Tr. II, 81-92.)  When Lake helped Petitioner clean his broken-down car on December 6, she saw cigarette burns in the back seat, but did not see any blood; nor was she asked to clean any blood out of the car.  (Tr. II, 79.)  It was not unusual for Petitioner to be cleaning his car because he always wanted to sell it.  (Tr. II, 78-9.)  Lake did not feel at all afraid or threatened when Petitioner said to her, "why, do you think I should kill you?" because they were bickering with one another that day; and Lake simply went to bed thereafter.  (Tr. II, 80.)  Lake was only afraid of Petitioner in hindsight, after police had told her he was a suspect in Howard Ringleka's death.  (Tr. II, 80-81.)

Out of the presence of the jury, Petitioner's counsel objected to the prosecutor's planned introduction of a DNA lab report indicating that Howard Ringleka's DNA was on the ax, because she had not received a copy of the report until a few days prior to trial.  (Tr. II, 84-85.) Counsel also objected to the planned introduction of a lab report indicating human blood was found on the ax, because she had just received a copy of the report that day.  (Tr. II, 85-86.)  The court denied Petitioner's motion to exclude the evidence, finding that there was no undue surprise in either report.  (Tr. II, 88-89.)

Over Petitioner's objections, the court certified Michigan State Police forensic scientist Ann Chamberlain as an expert in serology.  (Tr. II, 91-94); Chamberlain testified as follows. At 5:30 a.m. on December 5, 1999, Chamberlain arrived at the Ringleka residence with Detective Robert Slick and forensic scientist Jeff Nye; Chamberlain took photographs and notes and collected

evidence at the scene.  (Tr. II, 95, 100.)  On December 21, 1999 Chamberlain and Slick analyzed a royal blue 1993 Grand Prix LE at the Montcalm Sheriff's garage in connection with the Ringleka murder.  (Tr. II, 95-96.)  Chamberlain  used Luminol to process the car's interior for blood, which indicated the possible presence of blood on the left rear passenger door handle; rear passenger seat; left back seat carpet floor; right rear passenger floor; right passenger front door grip; right passenger door carpet; driver's front seat; left rear passenger door; side and middle of the passenger front seat; right passenger back seat; back seat cushion; passenger back left and right floor; passenger left back seat; driver headrest; and trunk area.  (Tr. II, 96-97.)  Chamberlain took swabs and samples of many of these sites; lab analysis on them indicated human blood on the right rear passenger floor; left rear passenger door handle; and right passenger front door grip.  (Tr. II, 97-99.)  Her tests for human blood on the driver's seat were negative; which may have indicated the sample was in fact animal blood, iron, or rust; or that Pine Sol or any other cleaning agent had diluted the sample and/or degraded the DNA.  (Tr. II, 102-103.)  Chamberlain packaged the car interior samples and sent then for DNA analysis.  (Tr. II, 99.)  Chamberlain also analyzed a knife after Detective Slick had tested it; her analysis indicated there was no possible presence of human blood on the knife.  (Tr. II, 100.)  Chamberlain had seen the knife at the crime scene but had not collected it.  (Tr. II, 101-02.)  At trial, Chamberlain identified the knife she and Slick had analyzed; the court admitted it into evidence. (Tr. II, 100-01.)

Chamberlain further testified that when she first arrived at the Ringleka residence, she saw an ax lying in the driveway, with "suspected blood all over it," before it was covered. (Tr. II, 103-04, 110.)  Jeff Nye collected the ax, then gave it to Chamberlain for analysis.  (Tr. II, 104.)  Chamberlain found the possible presence of human blood on the ax; she then took swabs of

- 17 -

the ax and put them in frozen storage at the lab for further DNA analysis.  (Tr. II, 104, 105.)
Chamberlain then re-sealed the ax into the packaging in which it came to her and gave it to Detective
Slick for latent fingerprint testing. (Tr. II, 104-05.) At trial, Chamberlain identified as authentic her
initials and lab number on the base of the ax handle in a proposed prosecution exhibit that was later
admitted into evidence.  (Tr. II, 126-27.)

   Chamberlain further testified that tests she conducted in the house indicated human
blood in a hand print and other smears outside the bathroom doorway.  (Tr. II, 106-07.)  There were
spots on the floor that appeared to be areas of blood transfer from footwear to carpeting.  (Tr. II,
108.)  Chamberlain tested two to four pairs of shoes that were taken from Petitioner's bedroom for
blood, and found none. (Tr. II, 109.)

   The court certified Michigan State Police examiner Lieutenant Robert Slick as an
expert in latent fingerprints (Tr. II, 111-13); he testified as follows.   Chamberlain sent an ax from
the crime scene to Slick for latent print testing; when Slick had finished his analysis, he sent the ax
back to Chamberlain by placing it into a locked storage facility.  (Tr. II, 115, 120.)  Slick found no
identifiable prints on the ax.  (Tr. II, 120.)  He did not know what became of the ax after he tested
it.  (Tr. II, 116.)  At trial, Slick identified as authentic his initials, a case number, and a price sticker
he had seen on the ax he tested on an ax in sealed packaging the prosecutor showed him.  (Tr. II,
118-20.)  Slick did not know whether he had examined the ax prior to Chamberlain.  (Tr. II, 119.)
Slick tested a knife from the closet area of the crime scene and found no identifiable prints thereon.
(Tr. II, 116.)  He was also unable to obtain any identifiable prints off the money bag found at Howard
Ringleka's feet.  (Tr. II, 117.)  Slick's tests for latent prints revealed the following: one fingerprint
of Carla Ringleka's on a glass jar containing coins found on the kitchen table; four prints of Carla

- 18 -

Ringleka's on a green coffee cup from the kitchen table; and three prints of Howard Ringleka's on two checks found in the money bag  (Tr. II, 117-18.)  A fingerprint is a "very fragile piece of evidence" that can be easily washed off; additionally, sometimes no prints are left at all, even when gloves are not worn.  (Tr. II, 125.)  Rain can also wash away fingerprints.  (Tr. II, 125.)  Slick found no identifiable prints at all inside the 1993 Grand Prix.  (Tr. II, 125-26.)

   Lieutenant Slick testified on cross-examination that only a few days prior to trial, he been given the inked prints of Jerome Gass and Eric McMurtry, two other possible suspects in the Ringleka murder, for comparison with prints he found at the crime scene.  (Tr. II, 122-23.)  He therefore had not yet compared the impressions of Gass or McMurtry to latent prints he'd found on the coin jar, green mug, checks, bathroom door frame, front door, or bathroom sink area.  (Tr. II, 123-24.)  Slick found no matches between Petitioner's impressions and any prints found at the crime scene.  (Tr. II, 124.)

   The court certified Michigan State Police DNA Unit forensic scientist Jeffrey Nye as an expert in DNA profiling (Tr. II, 129-130); he testified as follows.  Nye complied with national guidelines, precautions, and controls while handling DNA samples taken from the Ringleka crime scene.  (Tr. II, 131-33.)  Nye received Chamberlain's swabbed samples from the ax and determined to a reasonable degree of certainty that the blood on the ax was Howard Ringleka's.  (Tr. II, 134-36.)  Nye assessed several samples Chamberlain had taken from a car interior and found to a reasonable degree of certainty a match with the blood of Howard Ringleka.  (Tr. II, 136-37, 146.)  Nye assessed samples taken from the Ringleka house and found that the blood smears on the wall outside the bathroom matched the blood of Howard Ringleka.  (Tr. II, 137.)  Nye also analyzed two cigarette butts found in the car; neither of them had Howard Ringleka's DNA on them.  (Tr. II, 138.)

On cross-examination, Nye conceded that he himself did not obtain the blood-soaked samples of Howard Ringleka's clothing from which he obtained Ringleka's DNA profile; and that DNA evidence generally has been excluded for questionable reliability and validity in a number of states.  (Tr. II, 140-41.)  On redirect, Nye stated that general controversy over DNA evidence did not lead him to question the results of his tests in the Ringleka case.  (Tr. II, 147.)

Montcalm County Sheriff's Department Detective Lieutenant Joseph Patino testified as follows.  On December 4, 1999, Patino was dispatched to the Ringleka residence as the lead investigator.  (Trial Tr. III, 5, 23-24, docket #19.)  The Crime Lab was allowed into the residence at about 2:00 p.m. on December 5; by that time, a lot of the evidence had been removed.  (Tr. III, 6.)  Patino and Detective Corwin removed the victim and searched the master bedroom.  (Tr. III, 6.)  Patino knew some firearms were missing from the house; he and Corwin searched the gun cabinet in the master bedroom.  (Tr. III, 6.)

Patino further testified that Carla Ringleka became a suspect in Howard Ringleka's murder.  (Tr. III, 6-7.)  After Carla admitted her involvement, and with her consent, the State Police recorded a telephone conversation between Carla and Petitioner on December 16, 1999; Patino had heard both Carla and Petitioner during this recorded conversation.  (Tr. III, 7, 15.)  The court admitted the tape of the conversation and it was played for the jury and transcribed into the trial record.  (Tr. III, 7-15.)  In it, Petitioner told Carla he never went inside the Ringleka house on the night of the murder; his fingerprints were not on anything in the house; and that he was "covered" because he had an alibi that he was out of town that night.  (Tr. III, 10-11, 13-14.)

Patino further testified that Petitioner was arrested on December 16, 1999.  (Tr. III, 21.)  Petitioner would not initially speak to Patino, and asked to speak with his wife, Laura Mosby,

who was employed at the District Court in Stanton.  (Tr. III, 24.)  Patino told Laura the information

he'd received from Carla and that Petitioner wanted to speak with Laura; Patino said nothing to

Laura about making any deals.  (Tr. III, 24.)  Laura talked to Petitioner for about forty-five minutes

and Petitioner then agreed to speak to police.  (Tr. III, 25.)  On December 17, Patino spoke with

Petitioner in custody; that conversation was also recorded, and Laura Mosby was present.  (Tr. III,

15, 24, 25.)  Over Petitioner's objection, the tape from Patino's conversation with Petitioner was

admitted into evidence and played for the jury, but was not transcribed into the trial record.  (Tr. III,

16.)  Patino spoke with Petitioner again on December 21, 1999, in an attempt to locate property

missing from the Ringleka residence.  (Tr. III, 17.)    That conversation was not recorded, but

Petitioner was advised of his Miranda rights prior to speaking.  (Tr. III, 17-18.)  Petitioner was not

threatened or promised anything during this conversation, and freely spoke to Patino.  (Tr. III, 19-

20.)  Petitioner told Patino he had dumped the missing property into the lake, which helped officials

recover some of the property.  (Tr. III, 18-19.)  Petitioner also talked about the Howard Ringleka

murder again, and explained he had taken an ax to the Ringleka residence and had told Eric

McMurtry that the ax was in the garage, which contradicted Petitioner's statement in his first

conversation with Patino in which he said he had not told Eric where the ax was.  (Tr. III, 18, 23.)[2]

Petitioner also said that "they" had used sheets or blankets to take the guns out of the house and that

"Mitch" had a knife with him on December 4.  (Tr. III, 18.)  During the December 21, 1999

conversation with Patino, Petitioner was allowed to smoke, which he was not allowed to do in his

cell; this may have had something to do with the length of the interview.  (Tr. III, 18-19.)  The 1993

---

[2]Petitioner apparently had previously told Patino that McMurtry murdered Howard Ringleka; McMurtry was
arrested on September 12, 2000.  (Tr. III, 23.)

Grand Prix that Petitioner spoke about in one of his interviews was the same car analyzed by Chamberlain and Slick. (Tr. III, 20.)

Patino further testified that he searched Bobbi Lake's residence in Orleans, Michigan, and found a receipt for Ralston's Hardware; the receipt was then admitted into evidence. (Tr. III, 20-21.) Patino also found some shoes during his search of Lake's house, which the lab thought they had analyzed. (Tr. III, 21.) The shoes did not appear to have anything detectible on them. (Tr. III, 22.) None of the shoes sent to the lab for analysis were recovered within a day or two of the murder. (Tr. III, 22.)

On cross-examination, Patino testified that his investigation proceeded as if Petitioner was the killer, even though Petitioner told Patino that Eric McMurtry held the ax; and McMurtry was charged with the crime in September 2000. (Tr. III, 23.) Patino stated that officials knew that three people were involved with the murder, but they were unable to find the other two right away. (Tr. III, 23.) Petitioner obtained a prescription for Paxil around December 20 when he was in jail. (Tr. III, 25-26.) Other than the ax, no physical evidence found at the crime scene connected Petitioner to the Ringleka residence. (Tr. III, 26-27.) The prosecution rested. (Tr. III, 30.)

Out of the presence of the jury, the court noted that the parties had agreed that it was not necessary to further mention the two other individuals who were charged in the Ringleka murder. (Tr. III, 31.) The court also noted that the parties had agreed to instructions on first-degree murder, second-degree murder, and conspiracy to commit first-degree murder. (Tr. III, 31.) Petitioner then moved for a directed verdict based on the prosecutor's failure to prove that Petitioner: (1) caused Howard Ringleka's death, (2) intended to kill Howard, or (3) conspired with anyone else to kill him. Petitioner pointed to the lack of evidence placing the ax in Petitioner's hands that night even though

it may have been his ax; unrefuted testimony that Petitioner had seen the ax in Eric McMutry's hands and was unaware on December 5 that the murder had occurred; and Petitioner's statements in the December 17, 1999 recorded conversation that he repeatedly talked Carla Ringleka out of killing her husband.  (Tr. III, 32-35.)  In response, the prosecutor pointed to Petitioner's and Carla's statements that Petitioner went to Detroit to find two people to kill Howard and provided them with the ax; and Petitioner's prior attempts on Howard's life in the weeks preceding the murder.  (Tr. III, 36-37.)

During this argument, the prosecutor told the court that her theory of Petitioner's liability was that of an aider and abettor: "[w]e have never alleged that [Petitioner] was the swinger of the ax and in reading the first degree premeditated murder instructions, you have to look at aiding and abetting.  Anyone who intentionally assists someone else is as guilty as the person who commits the crime and it doesn't matter whether anyone else has been convicted . . . but for [Petitioner's] actions, Howard Ringleka would not be dead . . . [Petitioner] set it up.  He got the people.  He got the weapon.  He got the people to the place."  (Tr. III, 37; see also Tr. III, 38.)  The court denied Petitioner's motion for a directed verdict, citing *People v. Hampton*,[3] because it was satisfied from both direct and circumstantial evidence that "under an aiding and abetting theory, [Petitioner] is responsible" for the first-degree premeditated murder of Howard Ringleka.  (Tr. III, 38-39.)  The court pointed out that Petitioner "if nothing else provided the transportation" of the killers to the Ringleka house.  (Tr. III, 39.)

---

[3]285 N.W.2d 284 (1979)(when ruling on a motion for a directed verdict of acquittal, trial court must consider all the evidence presented by the prosecution, view that evidence in a light most favorable to the prosecution, and "determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.") (Citations omitted).

At the conclusion of trial, on September 13, 2000, the jury found Petitioner guilty of first-degree murder and conspiracy to commit first-degree murder.  (Tr. III, 105.)  On October 13, 2000, the trial court sentenced Petitioner to serve a prison term of natural life on the murder conviction and forty to sixty years on the conspiracy to commit murder conviction, to run concurrent with one another, but consecutive to prior unrelated sentences.  (Sentencing Transcript, (S. Tr.), 4, docket #20.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 20, 2001, raised the following issues: (1) the trial court abused its discretion when it denied Petitioner's motion for change of venue, thereby depriving him of an impartial jury; (2) the trial court erred when it denied Petitioner's motion to suppress his statements to police, when the circumstances surrounding those statements showed that they were not made voluntarily; (3) the trial court abused its discretion when it refused to quash the information against Petitioner, when the evidence presented at the preliminary examination was neither credible nor competent; and (4) the trial court abused its discretion and denied Petitioner due process, a fair trial, and "effective assistance of counsel" when it admitted, over Petitioner's objection, DNA lab reports suggesting the victim's blood was on an ax that had been linked to Petitioner, when those reports were untimely submitted to Petitioner.  (*See* Def.-Appellant's Br. on Appeal, 5-6, docket #21.) Petitioner then substituted his appointed appellate counsel and moved the court of appeals to withdraw his appellate brief; the court denied the motion without prejudice to Petitioner's new counsel moving to withdraw the brief or filing a supplemental brief.  (*See* 4/18/02 MCOA Order, docket #21.)  On June 25, 2002, Petitioner filed a supplemental brief, which added a claim that

- 24 -

Petitioner was denied his state and federal constitutional right to effective assistance of counsel where trial counsel "opened the door during closing argument for the prosecutor to infer in rebuttal argument that the remaining two co-defendants had invoked their Fifth Amendment privilege not to testify." (*See* Supplemental Br. on Appeal, iii, docket #21.)[4] In an unpublished opinion issued on August 20, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 8/20/02 MCOA Op., docket #21.)

Through counsel, Petitioner filed a delayed application for leave to appeal in the Michigan Supreme Court. In it, he raised the same five claims raised before and rejected by the Michigan Court of Appeals. By order entered March 31, 2003, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded it should review the questions presented. (*See* 3/31/03 Mich. Order, docket #22.)

### C. Post-conviction relief

On March 19, 2004, Petitioner filed a *pro per* motion for relief from judgment in the Montcalm County Circuit Court, along with a motion for a Ginther[5] hearing. (*See* Pet., p. 4, docket #1; Mot. For Relief Fr. J., docket #23.) He raised the following three new issues: (1) Petitioner's Sixth Amendment right to effective assistance of appellate counsel was violated when appellate counsel[6] failed "to represent [Petitioner] as order[ed] by the court"; and failed to raise the "obvious" claims that (a) Petitioner's rights to confrontation and due process were violated, as "preserved in

---

[4]The Michigan Court of Appeals retroactively granted Petitioner's motion to file a supplemental brief and accepted the supplemental brief via order entered on July 11, 2002. (*See* 7/11/02 MCOA Order, docket #21.)

[5]*People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973).

[6]Petitioner named both of his appellate attorneys, William Van Eck and Susan Meinberg, in his Rule 6.500 motion. (*See* Mot. For Relief Fr. J., ¶¶ 4-17 and p. 15, docket #23.)

detail by objection in the Preliminary record," and that (b) Petitioner received ineffective assistance of trial counsel because counsel failed to file an interlocutory appeal "in regards to this preserved issue"; (2) Petitioner's state and Sixth Amendment right to effective assistance of counsel was violated (a) at the preliminary examination, because counsel failed to file an immediate interlocutory appeal from the trial court's refusal to exclude a prosecution witness's improper testimony, and (b) at trial, because counsel failed to call two key witnesses; and (3) Petitioner's Fourteenth Amendment due process right was violated because his indictment and information failed to give proper notice and/or an opportunity to be heard. (*See* Pet. Attach. 11-(A)-5, docket #1; Mot. For Relief Fr. J., 12, 16, 23, docket #23.) The circuit court denied Petitioner's motions on March 25, 2004. (*See* Pet., p. 4; 3/25/04 Order of the 8th Circuit Court for Montcalm County, docket #23.)

Petitioner moved for leave to appeal the circuit court's March 25, 2004 order in the Michigan Court of Appeals based on the same three issues in his Rule 6.500 *et seq*. motion. (*See* Pet. at 4.) With his application for leave to appeal, Petitioner filed a motion to remand for an evidentiary hearing. (*See* Mich. Ct. App. Case No. 254887 Docket Entry 12.) The court of appeals denied Petitioner's motion to remand and his application to appeal based on Michigan Court Rule 6.508(D). (*See* 12/1/04 MCOA Order, docket #23.) On January 31, 2005, Petitioner's delayed application for leave to appeal to the Michigan Supreme Court was rejected because it was filed after the 56-day deadline. (*See* Mich. Ct. App. Case No. 254887 Docket Entry 18; MICH. CT. R. 7.302(C)(2), (3).) Petitioner raised the same three issues in his application to the state supreme court that he'd raised in his motion for relief from judgment and in the state court of appeals. (*See* Pet., p. 5.) Petitioner sought no further post-conviction relief.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, 126 S. Ct. 2862 (June 12, 2006). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

- 27 -

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316.  The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.  However, the Sixth Circuit recently has clarified

- 28 -

that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A.    Ground I: Ineffective assistance of appellate counsel

As his first ground for habeas relief, Petitioner alleges that his Sixth Amendment right to effective assistance of counsel was violated because his appellate attorney:[7] (1) failed to raise an

---

[7]It is not entirely clear which of his two appellate attorneys Petitioner claims was ineffective. Petitioner names both his first court-appointed counsel William VanEck, and his replacement appellate counsel Susan Meinberg, in this section of his petition, but he does not clarify whether he contends both were ineffective. (*See* Pet. Attach. (7)-(14)-(A), docket #1.) I assess Ground I as though Petitioner argues both his first and second appellate attorneys were ineffective.

ineffective assistance of counsel claim based on preliminary examination counsel's failure to seek an interlocutory appeal from Carla Ringleka's improper testimony; (2) failed to raise an ineffective assistance of counsel claim based on trial counsel's failure to investigate two potential witnesses and failed to raise Carla Ringleka's improper preliminary examination testimony in the trial court; and (3) failed to represent Petitioner as ordered by the court.  (*See* Pet. Attach. (7)-(14)-(A), docket #1.)

In support of Ground I, Petitioner contends that his preliminary examination counsel's failure to file an interlocutory appeal based on Carla Ringleka's improper testimony, his trial counsel's failure to investigate key witnesses Brett Ringleka and Dolly Ringleka, and his trial counsel's failure to raise Carla Ringleka's improper preliminary examination testimony in the trial court, were "obvious" errors that appellate counsel should have recognized and raised on appeal. (*See* Pet. Attach. (7)-(14)-(A), docket #1.)  Petitioner further asserts that he was "prejudiced" on appeal because his appointed appellate attorney William VanEck had his son, Todd VanEck, represent Petitioner, when Todd VanEck was not appointed to represent Petitioner. (*Id.*)

Petitioner raised Ground I for the first time in his motion for relief from judgment in the circuit court; that court denied relief under MICH. CT. R. 6.508(D) based on Petitioner's failure to establish cause or prejudice sufficient to excuse his failure to raise the issue in an earlier motion or on appeal.  (*See* 3/25/04 Order of the 8th Circuit Court for Montcalm County, docket #23.)  The court further reasoned that "[p]ost appeal disagreement with trial or appellate strategy is not ineffective assistance of counsel." (*Id.*)  The Michigan Court of Appeals denied leave under Rule 6.508(D).  (*See* MCOA Op., docket #23.)  Petitioner's application for leave to appeal in the Michigan Supreme Court was rejected as untimely.  (*See* Mich. Ct. App. Case No. 254887 Docket

Entry 18.)  Ground I is procedurally defaulted based on the Michigan Supreme Court's rejection of

Petitioner's application as untimely.[8]

       When a state-law default prevents further state consideration of a federal issue, the

federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst*

*v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982).   To

determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must

consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the

last state court rendering judgment on the claim at issue actually enforced the state procedural rule

so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state

ground foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,*

377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster v. Adams*,

324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell*

*v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  A state procedural rule is independent and adequate

if it was "firmly established and regularly followed" at the time of the asserted procedural default.

*Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24

(1991)).

       Here, Petitioner defaulted Ground I in the Michigan state courts, because he failed

to comply with the filing deadline for appeals in the Michigan Supreme Court.  Michigan law clearly

requires that an application for leave to appeal a criminal conviction in the Michigan Supreme Court

---

[8]Ground I is not procedurally defaulted based upon the Michigan Court of Appeals denial of leave based on MICH. CT. R. 6.508(D).  Rule 6.508(D)(3) bars collateral review of claims that could have been raised on direct appeal, but were not.  Petitioner's ineffective assistance of appellate counsel claim as set forth in Ground I could not have been raised on direct appeal because Petitioner's appellate attorney would have had to argue "that he or she was currently providing ineffective assistance of counsel."  *See Munson v. Kapture*, 384 F.3d 310, 315 n.2 (6th Cir. 2004).

be filed within fifty-six days after the lower court decision. MICH. CT. R. 7.302(C)(2), (3). Petitioner failed to timely file his application under Rule 7.302(C)(2), and the Michigan Supreme Court rejected it on January 31, 2005. (*See* Mich. Ct. App. Case No. 254887 Docket Entry 18.) The procedural rule relied upon by the Michigan Supreme Court to bar review of this issue was firmly established and regularly applied in 2005, the date of Petitioner's default. The requirement that leave to appeal be timely pursued in the Michigan Supreme Court is of ancient vintage. *See* GEN. CT. R. 1963, 853 (effective Jan. 1, 1965); MICH. CT. R. 7.302 (effective Mar. 1, 1985). Consequently, Petitioner procedurally defaulted Ground I by failing to timely file an application for leave to the Michigan Supreme Court.

If a petitioner procedurally defaulted his federal claim in state court, he must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 126 S. Ct. at 2076-77. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id*. (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). To show cause sufficient to excuse a failure to raise claims on direct appeal, a petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

- 32 -

Here, Petitioner has not attempted to explain his failure to file a timely application for leave to appeal in the Michigan Supreme Court.  Where, as here, a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Accordingly, because Ground I is procedurally barred, I find that habeas relief on this Ground is not warranted.

### B.     Ground II: Ineffective assistance of counsel at preliminary examination and at trial

Petitioner next alleges that his Sixth Amendment right to effective assistance of counsel was violated by his preliminary examination attorney's failure to seek an interlocutory appeal from prosecution witnesses' improper testimony; and by his trial attorney's failure to call two key witnesses.[9]  (*See* Pet. Attach. (7)-(14)-(B), docket #1.)  In support of Ground II, Petitioner contends that it was highly improper for Carla Ringleka to have her attorney seated directly beside her and assist her as she testified at Petitioner's preliminary examination, and that Petitioner's preliminary examination counsel should have filed an interlocutory appeal when the magistrate overruled Petitioner's objection thereto.  Petitioner is silent as to why his trial attorney should have called Dolly Ringleka and Brett Ringleka at trial.

Petitioner raised Ground II for the first time in his motion for relief from judgment in the circuit court, which was denied under MICH. CT. R. 6.508(D).  (*See* 3/25/04 Order of the 8th Circuit Court for Montcalm County, docket #23.)  The Michigan Court of Appeals denied leave to appeal this ruling under Rule 6.508(D).  (*See* MCOA Op., docket #23.)  The Michigan Supreme

---

[9]Although Petitioner does not name the "two key witnesses" in this section of his petition, I presume he means Dolly Ringleka and Brett Ringleka, the two "key witnesses" he names in support of Ground I.  (*See* Pet. Attach. (7)-(14)-(A), docket #1.)

Court rejected Petitioner's application for leave to appeal as untimely. (*See* Mich. Ct. App. Case No. 254887 Docket Entry 18.) Petitioner defaulted Ground II in the Michigan state courts both because he failed to comply with MICH. CT. R. 6.508(D), and because the Michigan Supreme Court rejected his leave application as untimely. Both Rule 6.508(D) and Rule 7.302(C)(3) are state procedural rules precluding a state court from considering an issue; the state court of appeals and state supreme court invoked Rule 6.508(D) and Rule 7.302(C)(3), respectively, in denying review of Ground II; and each of these procedural rules constitutes an independent and adequate ground on which Michigan state courts may rely in foreclosing review of federal claims. *See Munson*, 384 F.3d at 315; GEN. CT. R. 1963, 853 (effective Jan. 1, 1965); MICH. CT. R. 7.302 (effective Mar. 1, 1985).

Because Ground II is procedurally defaulted, Petitioner must demonstrate cause and prejudice or a miscarriage of justice to overcome the default and have this Court to review this claim. *See House*, 126 S. Ct. at 2076; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551. Petitioner appears to argue that he did not raise Ground II on direct review because his appellate counsel was ineffective. (*See* Pet. Attach. (7)-(14)-(A), docket #1.) To serve as cause to excuse a default, a claim of ineffective assistance of counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted. However, because review of the claim was denied by the Michigan Court of Appeals pursuant to MICH. CT. R. 6.508(D), and review was denied by the Michigan Supreme Court pursuant to MICH. CT. R. 7.302(C)(3), the claim also is procedurally defaulted. Nevertheless, Petitioner's claim of ineffective assistance of appellate counsel may serve as cause to excuse a procedural default. *See Whiting v.*

- 34 -

*Burt*, 395 F.3d 602, 615 n.7 (6th Cir. 2005); *Deitz v. Money*, 391 F.3d 804, 810 (6th Cir. 2004);

*Munson*, 384 F.3d at 315 n.2, 316; *Hicks v. Straub*, 377 F.3d 538, 558 n.17 (6th Cir. 2004)

       In order to excuse his default, Petitioner must show that his appellate counsel's failure

to raise the ineffectiveness of trial counsel issue rose to the level of a constitutional violation under

*Strickland v. Washington*, 466 U.S. 668 (1984).  *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th

Cir. 2004).  Under *Strickland*, Petitioner must prove the following to establish a claim of ineffective

assistance of counsel: (1) that counsel's performance fell below an objective standard of

reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in

an unreliable or fundamentally unfair outcome.  *See Strickland*, 466 U.S. at 687.  Counsel's failure

to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that

inclusion of the issue would have changed the result of the appeal.  *See McFarland*, 456 F.3d at 699

(citing *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  Thus, in order to decide whether

Petitioner can present his claims of ineffective assistance of trial counsel, I must decide whether

there is a reasonable probability that the claims would have prevailed at the time appellate counsel

failed to raise them.  *See McFarland*, 356 F.3d at 699.

       There is no reasonable probability that, had either of Petitioner's appellate attorneys

raised his claims of ineffective assistance of preliminary examination counsel or trial counsel on

direct appeal, these claims would have prevailed.  *See McFarland*, 356 F.3d at 699.  Preliminary

examination counsel's failure to seek an interlocutory appeal from Petitioner's bind-over based on

Carla Ringleka's testimony did not fall below an objective standard of reasonableness.  Such an

appeal would have been purely discretionary.  *See* MICH. CT. R. 7.103(A), (B)(5).  I further note that

such an interlocutory claim would not likely have succeeded, given the relaxed standard of proof at

preliminary examination, i.e. probable cause that a crime was committed, and probable cause that the defendant committed the crime.  *See* MICH. CT. R. 6.110(E).  Nor did counsel's failure to pursue such an appeal prejudice Petitioner so as to result in a fundamentally unfair outcome at preliminary examination.  With regard to trial counsel's failure to call two "key" witnesses, Petitioner provides no explanation whatsoever as to who Dolly Ringleka and Brett Ringleka are, let alone why their testimony was critical to his defense.  (*See* Pet. Attachs. (11)-(A)-(5), (7)-(14)-(A), docket #1.) Without such support, this argument is purely speculative; I therefore cannot possibly conclude that these claims would have succeeded if counsel had raised them on appeal.  *See McFarland*, 356 F.3d at 699.  Because Ground II is procedurally barred, I find that habeas relief on this ground is not warranted.

### C.      Ground III: Inadequate indictment and information

As his third ground for habeas relief, Petitioner argues that his Fourteenth Amendment right to due process of law was violated by the State's indictment against him because it did not adequately notify Petitioner of the charges against him or provide him an opportunity to be heard.  (*See* Pet. Attach. (7)-(C), docket #1.)  He claims that although he was bound over on one count each of first-degree murder and conspiracy to commit first-degree murder, during trial the prosecutor improperly changed the first degree murder charge to aiding and abetting first degree murder; and the court improperly allowed the change after closing arguments.  (*See* Pet. Attach. (7)-(C), docket #1, citing Trial Tr. I, 97-98, 131.)  Petitioner claims that if he had known the charge against him was aiding and abetting first-degree murder rather than first-degree murder itself, he could have prepared a more accurate defense, i.e., that he did not aid or abet in the first-degree premeditated murder of Howard Ringleka.  (*See* Pet. Attach. (7)-(C).)

- 36 -

Petitioner raised Ground III for the first time in his motion for relief from judgment, which the circuit court denied pursuant to Mich. Ct. R. 6.508(D).  (*See* 3/25/04 Order of the 8th Circuit Court for Montcalm County, docket #23.)  The Michigan Court of Appeals denied leave under Rule 6.508(D).  (*See* MCOA Op., docket #23.)   The Michigan Supreme Court rejected Petitioner's application to appeal as untimely.  (*See* Mich. Ct. App. Case No. 254887 Docket Entry 18.) Petitioner defaulted Ground III in the Michigan state courts both because he failed to comply with Mich. Ct. R. 6.508(D), and because the Michigan Supreme Court rejected his leave application as untimely.  Both Rule 6.508(D) and the Supreme Court's 56-day filing deadline are procedural rules precluding a state court from considering an issue; the state court of appeals and state supreme court invoked Rule 6.508(D) and Rule 7.302(C)(3), respectively, in denying review of Ground III; and each of these procedural rules constitutes an independent and adequate ground on which Michigan state courts may rely in foreclosing review of federal claims.  *See Munson v. Kapture*, 384 F.3d 310, 315 (6th Cir. 2004); Gen. Ct. R. 1963, 853 (effective Jan. 1, 1965); Mich. Ct. R. 7.302(3) (effective Mar. 1, 1985).

Because Ground III is procedurally defaulted, Petitioner must demonstrate cause and prejudice or a miscarriage of justice to overcome the default and have this Court to review this claim. *See House*, 126 S. Ct. at 2076; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551.  Petitioner appears to argue that he did not raise Ground III on direct review because his appellate counsel was ineffective.  (*See* Pet. Attach. (7)-(14)-(A), docket #1.)  Thus, in order to decide whether Petitioner can present his inadequate indictment claim, I must determine whether there is a reasonable probability that the claim would have prevailed at the time appellate counsel failed to raise it.  *See McFarland*, 356 F.3d at 699.

- 37 -

There is no probability that, had appellate counsel raised Ground III on direct appeal, the claim would have prevailed. Petitioner's information was constitutionally adequate. An indictment is constitutionally adequate if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Anderson*, No. 98-3704, 1999 WL 503519, at *3 (6th Cir. July 9, 1999) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974), *United States v. Monus*, 128 F.3d 376, 388 (6th Cir.1997) and *United States v. Martinez*, 981 F.2d 867, 872 (6th Cir.1992)). In the Sixth Circuit, "except for the issue of notice, a claimed deficiency in a state criminal indictment is not cognizable in federal habeas corpus." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002); see also *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988).

Contrary to Petitioner's contentions, the information in this case provided ample notice of the charges against him. The information charged him with first-degree murder, conspiracy to commit first-degree murder, and solicitation to commit first-degree premeditated murder. The examining magistrate bound Petitioner over on the murder and conspiracy charges; and the jury convicted Petitioner on both counts. Petitioner complains that while his information charged him with first-degree murder and conspiracy to commit first-degree murder, at trial the prosecution improperly "amended" its theory of Petitioner's liability to aiding and abetting. (*See* Pet. Attach. (7)-(C), docket #1.) This argument is meritless. In Michigan, there is no distinction between principals and accessories. As a result, aiding and abetting is an alternative theory of guilt on a direct charge. MICH. COMP. LAWS § 767.39. *See also People v. Mann*, 236 N.W.2d 509, 511 (Mich. 1975) ("[a] person who aids and abets is guilty as a principal.") Because "he who aids and abets is [also] a

- 38 -

principal," a defendant charged as a principal is on notice that, if the evidence indicates he was an accessory to others, he may be convicted on the direct charge as an aider/abettor. *Mann*, 236 N.W.2d at 511 (citing *People v. McKeighan*, 171 N.W. 500 (Mich. 1919) (holding information charging defendant as a principal supported his conviction as an aider/abettor)).

Because Petitioner's information was constitutionally adequate, there is no probability that, had appellate counsel raised Ground III on direct appeal, the claim would have prevailed. Petitioner's ineffective assistance of appellate counsel therefore does not serve as cause to excuse his default on Ground III. Because Petitioner has not established cause, the Court need not address prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy,* 757 F.2d at 100. Accordingly, because Ground III is procedurally barred, I find that habeas relief on this ground is not warranted.

Furthermore, I find that, even if Ground III were not procedurally defaulted, Petitioner would not be entitled to habeas relief therefor. Because Petitioner's information provided ample notice, it is not cognizable on habeas corpus. *See Roe,* 316 F.3d at 570.

### E.    Ground IV: Denial of Petitioner's motion for change of venue

Petitioner next argues that he was deprived of his constitutional right to an impartial jury when the trial court denied his motion for a change of venue. (*See* Pet. Attach. (8)-(14)-(D), docket #1.) Petitioner argues two bases for this ground. First, he asserts that in the months leading up to his trial, more than 20 articles ran in Montcalm County's only newspaper, the Daily News; 15 of which appeared on the front page, and some of which disclosed "inadmissible and highly prejudicial information," including Petitioner's criminal history and parolee status[10] at the time of

---

[10]Petitioner pleaded guilty to one charge of bank robbery in the Kent County Circuit Court in 1989. He was apparently on parole from his sentence on this conviction at the time of the Ringleka murder.

the Ringleka murder.   (Pet. Attach. (8)-(14)-(D).)   Petitioner claims that the extensive,

"inflammatory" publicity surrounding the allegations against him created "an atmosphere of

prejudice" against him.  (Pet. Attach. (8)-(14)-(D).)  Second, Petitioner claims that, as an African-

American man charged with a "heinous" crime in a predominantly white community, who faced a

predominantly white jury, he likely did not receive a fair trial. (*Id*.)  Based on Ground IV, Petitioner

requests a reversal of his convictions and remand for retrial in a different, unspecified, venue.  (*Id*.)

      (i)      Pretrial Publicity

      The Michigan Court of Appeals held as follows on Petitioner's claim that

inflammatory pretrial publicity warranted a change of venue:

> Defendant contends that the trial court improperly denied his pretrial motion
> for a change of venue.  Specifically, defendant contends that a change of venue was
> necessary because: (i) he was prejudiced by the extensive and inflammatory publicity
> regarding the crime during the months preceding trial; and (ii) he was "an African
> American male charged with killing a white man in a substantially all white
> community."
>
> Ordinarily, a defendant "must be tried in the county where the crime is
> committed."  *People v Jendrzejewski*, 455 Mich 495, 499; 566 NW2d 530 (1997),
> citing MCL 600.8312.  However, "in special circumstances where justice demands
> or statute provides," a trial court may order a change of venue to another county.  *Id.*
> at 500.   Our Supreme Court described the following two "approaches" for
> determining whether the trial court abused its discretion in denying a motion to
> change venue because of concern regarding the defendant's ability to receive a fair
> trial:
>
> > Community prejudice amounting to an actual bias has been found
> > where there was extensive highly inflammatory pretrial publicity that
> > saturated the community to such an extent that the entire jury pool
> > was tainted, and, much more infrequently, community bias has been
> > implied from a high percentage of the venire who admit to a
> > disqualifying prejudice. [*Id*. at 500-501.]
>
> To determine if a defendant's trial was fundamentally fair, the court must look at the
> totality of the circumstances, including whether media coverage remained "largely

factual" or became "invidious or inflammatory." *Id.* at 502, 504, quoting *Murphy v Florida*, 421 US 794, 799-800; 95 S Ct 2031; 44 L Ed 2d 589 (1975). In addition to examining the pretrial publicity, the entire voir dire must also be examined to determine if an impartial jury was impaneled. *Jendrzejewski, supra* at 517.

Generally, we review a trial court's decision to grant or deny a change of venue for an abuse of discretion. *Jendrzejewski, supra* at 500, quoting *People v Swift*, 172 Mich 473, 480; 138 NW 662 (1912). "An abuse of discretion will be found only when an unprejudiced person, considering the facts on which the trial court acted, would concede that there was no justification or excuse for the ruling made." *People v Tate*, 244 Mich App 553, 559; 624 NW2d 524 (2001).

In this case, thirty-seven jurors were questioned during voir dire. Twenty-two of the thirty-seven jurors stated that they had read, heard, or discussed this case in some way, and only two expressed any concern about being prejudiced because of the pretrial publicity. In light of the very low percentage of potential jurors who indicated a possible prejudice, we are not persuaded that defendant has demonstrated a "community bias" based on "a high percentage of the venire who admit to a disqualifying prejudice." See *Jendrzejewski, supra* at 500-501. Similarly, it does not appear that the jury pool had been tainted. See *id.* Moreover, given the slight majority of jurors who were at all familiar with the case based on pretrial publicity, it does not appear that the community had been "saturated" by the pretrial publicity. *Id.* Finally, after reviewing the newspaper articles, we do not believe that they could properly be construed as "highly inflammatory"; rather, the articles presented the matter in a largely fair and accurate manner. *Id.* Consequently, we conclude that the trial court did not abuse its discretion by denying defendant's motion for a change of venue based on the pretrial publicity.

(MCOA Op. at 1-2, docket #21.) The Michigan Supreme Court denied leave because it was not persuaded it should review the issue. (*See* Mich. Order, docket #22.)

It is a "basic requirement of due process" guaranteed by the right to trial by jury that the "criminally accused [receive a] fair trial by a panel of impartial, 'indifferent' jurors." *Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). Clearly established Supreme Court authority distinguishes between cases of "presumed prejudice - when the setting of the trial is inherently prejudicial," and "actual prejudice - when review of both the jury *voir dire* testimony and the extent and nature of media coverage indicates a fair trial was impossible."

*Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (citing *Murphy v. Florida*, 421 U.S. 794, 798 (1975)); *see also Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds by Harris*, 212 F.3d at 943.

   The Supreme Court first acknowledged the distinction between actual and presumed prejudice in *Murphy*.  The Court discussed three previous cases in which it found circumstances warranting a presumption of prejudice:  *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).  *Rideau* involved the televising of an in-jail 20-minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted. The Court concluded that Rideau presumptively could not have received a fair trial in that parish "because it considered the trial under review 'but a hollow formality'--the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras." *Murphy*, 421 U.S. at 799.  The trial in *Estes* had been conducted in a "circus atmosphere," where the courtroom was overrun with television equipment.  *Murphy*, 421 U.S. at 799.  *Sheppard* similarly involved extremely inflammatory publicity, as well as a carnival-like atmosphere in the courtroom created by the media presence. *Murphy*, 421 U.S. at 799.  Referring to *Estes* and *Sheppard*, the Court stated:

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

*Murphy*, 421 U.S. at 799.

- 42 -

In the absence of the "televised confession amounting to a trial" or a "carnival atmosphere," actual prejudice may be inferred from the nature and extent of the publicity and the juror *voir dire* testimony. *Ritchie*, 313 F.3d at 955. The Supreme Court made such a finding of actual prejudice in *Irvin v. Dowd*, 366 U.S. 717 (1961). In *Irvin*, the defendant was tried in a small community that was widely aware of his prior convictions, his confession to 24 burglaries and six murders (including the one for which he stood trial), and his unaccepted offer to plead guilty in order to avoid a death sentence. *Murphy*, 421 U.S. at 798. In addition to this prejudicial information before the trial began, eight of the twelve empaneled jurors had already formed the opinion that the defendant was guilty. *Id.* Furthermore, 268 of the 430 venire men were excused because they indicated an opinion as to the petitioner's guilt. In reaching its decision in *Irvin*, the Supreme Court noted:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23. Nevertheless, "the juror's assurances that he is equal to the task cannot be dispositive of the accused's rights, it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800 (*quoting Irvin*, 366 U.S. at 723). After discussing the facts of *Irvin*, the *Murphy* Court noted, " In these circumstances, the [*Irvin*] Court readily found actual prejudice against the petitioner to a degree that rendered a fair trial impossible." *Murphy*, 421 U.S. at 798.

Comparing the facts in *Murphy*, where the petitioner claimed that the jury had learned of a prior conviction and certain facts about the crime at issue due to extensive pre-trial media coverage, the Supreme Court found "no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy*, 421 U.S. at 799. In *Murphy*, for example, only 20 of the 78 venire men were excused because they had formed an opinion as to the petitioner's guilt.

The Supreme Court followed both the principles and result of *Murphy* in two subsequent cases concerning extensive pre-trial publicity: *Dobbert v. Florida*, 432 U.S. 282 (1977) and *Patton v. Yount*, 467 U.S. 1025 (1984). Dobbert, who was accused of torturing and murdering his children, claimed that he was denied a fair trial as the result of excessive press coverage. The Supreme Court disagreed, stating:

> Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy*, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida, supra*, 421 U.S., at 798, 95 S. Ct., at 2035. One who is reasonably suspected of murdering his children cannot expect to remain anonymous. Petitioner has failed to convince us that under the "totality of circumstances," *Murphy, supra*, the Florida Supreme Court was wrong in finding no constitutional violation with respect to the pretrial publicity.

*Dobbert*, 432 U.S. at 303.  *Patton* similarly involved the much-publicized case of a high school teacher accused of raping and murdering one of his female students.  After reviewing the extent and nature of the pretrial publicity and the *voir dire* testimony, the Court again concluded that "the jurors at Yount's trial had [not had] such fixed opinions that they could not judge impartially the guilt of the defendant."  *Patton*, 467 U.S. at 1035.

In this case, the Michigan Court of Appeals concluded that Petitioner was not deprived of a fair trial when the trial court denied his motion to change venue.  The court of appeals followed the "presumed prejudice" and "actual prejudice" standards set forth in *Murphy*.  (*See* MCOA Op. at 1-2) (citing *Murphy*, 421 U.S. at 799-800, and *Jendrzejewski*, 455 Mich. at 499).  I find that the court of appeals properly applied, and complied with, the U.S. Supreme Court precedent of *Murphy*.  Contrary to Petitioner's vague claim that the pretrial publicity surrounding this case created "an atmosphere of prejudice," this case clearly does not present those rare circumstances in which the criminal proceedings were so utterly corrupted by media coverage that prejudice must be presumed.  Unlike *Estes* and *Sheppard*, this case did not involve a media-created carnival atmosphere in the courtroom during trial.  Nor does it involve the televising of a videotaped confession as found in *Rideau*.  Accordingly, Petitioner is not entitled to a presumption of prejudice.  Instead, the court must consider whether actual prejudice may be inferred from the nature and extent of the publicity and the juror *voir dire* testimony.  *See Ritchie*, 313 F.3d at 955.

Petitioner argues that this case received extensive newspaper coverage.  According to Petitioner, the local newspaper, the Daily News, is Montcalm County's only newspaper.  (Pet. at (8)-(14)-(D).)  He claims that in the months preceding his trial, 20 articles related to this case appeared in that paper, 15 of them on the front page.  (*Id*.)  Petitioner's motion for change of venue, which he

- 45 -

attached to his habeas application, includes 20 articles that apparently appeared in the Daily News. Although most of the articles are undated, they appear to have run in the four-month period between December 6, 1999 through March or April 2000, when Petitioner sought a change of venue.  (*See* Mot. For Change of Venue, docket #1.)  Therefore, on average, a newspaper article related to this case appeared approximately four to five times each month during that period.

       The first few articles Petitioner attaches reported little more than the general facts of Howard Ringleka's death, did not disclose the possible source or extent of his injuries, and asked readers with any information to call the sheriff's office.  Subsequent pieces reported that Carla Ringleka was arrested in connection with the murder, and again encouraged those with any information to contact authorities.  The first article that reported Petitioner's arrest noted that he had been convicted of bank robbery in 1989, "served time" on that conviction, was released on parole in 1998, and had been "picked up" for a parole violation.  This article also reported that Petitioner and Carla Ringleka had been arraigned as co-conspirators in the murder and would be tried together.  The article further noted that the trial judge referred to "Mitch" and "Eric" when addressing Petitioner in court; and that the prosecutor would not comment on whether she believed Petitioner was the individual who had committed the actual murder.   The next few articles mentioned Petitioner by name, and that Ringleka had been killed with an ax; but also reported on whether "Mitch" and "Eric," also "potential suspects," had been arrested.  The prosecutor again declined to comment on which individual she believed killed Ringleka, but the article noted that police did not believe Carla was the actual killer.  Details surrounding Carla and Petitioner's alleged relationship and conspiracy, Howard Ringleka's ax wounds, the scene of the murder, the involvement of Eric McMurtry and two other men on the night of the murder, and Carla's plea to second-degree murder were reported in articles

covering Carla's February 2000 preliminary examination.  In one of these articles it was reported for the first time that prosecutors believed that Petitioner "committed the murder alone."  In the months following Petitioner's February 2000 preliminary examination, articles reported on trial dates, Petitioner's substitution of attorneys, and his motion for a change of venue.  In one of these articles, a prosecutor was quoted as saying that, because of the familiarity of the case, and because prospective jurors might know one or more persons involved in the case, the jury selection might encompass a "bigger pool" of county residents.  Two articles reported on the winter and spring dives that yielded items believed to have been taken from the Ringleka home at the time of the murder.

I find that the articles Petitioner provides contain nothing so inherently prejudicial that a juror would be unable to disregard it.  The nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered.  *See Murphy*, 421 U.S. 794.  In particular, knowledge acquired before trial that the defendant had confessed, prominent in *Irvin* and absent in this case, has always been regarded as especially prejudicial.  *See, e.g.*, *Murphy*, 421 U.S. at 799; *Goins*, 605 F.2d at 951.  In this case, jurors' knowledge that Petitioner had been convicted of bank robbery ten years earlier and was paroled at the time of his arrest in connection with the Ringleka murder – assuming they'd read and retained that information – is not so inherently prejudicial that a juror would be unable to disregard it and/or be more likely to convict Petitioner based thereon.  Reports chronicling the prosecutors' eventual belief that Petitioner "acted alone," in the absence of any other inflammatory comments, was not prejudicial, but merely presented the prosecution's evolving theory of liability in a straightforward and objective manner.

- 47 -

A review of the jury *voir dire* testimony in this case also fails to reveal a "community deeply hostile to the accused." *See Murphy*, 421 U.S. at 803. In *Murphy,* where twenty jurors were dismissed for cause, the Supreme Court commented, "This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." 421 U.S. at 803.  Of the thirty-six or thirty-seven potential jurors questioned at *voir dire* in the present case, twenty-two were excused, five of them for cause. (*See* Tr. I, 54-55, 83, 96-97, 109-110.) Consequently, using *Murphy* as guidance, the fact that only five jurors were excused for cause in this case falls far short of demonstrating actual prejudice.

Of the fourteen people ultimately selected to serve as jurors in Petitioner's case, approximately ten of them had read something about the case in the newspaper.  Three of them indicated that they only recalled seeing something in the paper when the crime first occurred, nine months before trial. (Tr. I, 76, 78, 101, 110.) The chosen jurors, each of whom had some knowledge of the case, were asked whether they had formed any conclusions as to the guilt or innocence of Petitioner, and whether they could reach a fair and impartial verdict based on the evidence.  Each of the fourteen chosen responded that he or she could be fair and impartial.  (Tr I, 29-32, 61, 72-81, 101-104, 107-08, 110-113.)  The one potential juror that said she had already formed an opinion regarding Petitioner's guilt as a result of the articles she'd read and discussions she'd had with others was stricken for cause.  (Tr. I, 93-96.)

Petitioner could not expect to remain anonymous given the brutal nature of Howard Ringleka's murder.  As the Supreme Court stated in *Dobbert*, 432 U.S. at 303, the fact that the community was well aware of the crime is not sufficient by itself to render a trial constitutionally

unfair.  Neither the media coverage nor the jury *voir dire* in this case reveal a climate of hostility in the community that rendered the jurors unable to decide Petitioner's case fairly and impartially. Accordingly, I cannot find that the state court's decision regarding the impartiality of the jury was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

  (ii) <u>Racial Composition of the Jury</u>

  Petitioner's second contention, that, based on the  racial composition of his jury, the trial court abused its discretion by denying Petitioner's motion for a change of venue, likewise did not run afoul of any Supreme Court precedent.  The Michigan Court of Appeals held as follows on this aspect of Ground IV:

> In addition, we reject defendant's contention that the trial court abused its discretion by denying defendant's motion for a change of venue based on the racial composition of his jury.  In *People v Williams*, 241 Mich App 519, 525-526; 616 NW2d 710 (2000), we explained:

>> To determine whether a prima facie violation of the fair-cross-section requirement of US Const, Am VI has occurred, the court must find the following: (1) the group alleged to be excluded must be a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion of the group in the jury-selection process.

> It is well established, however, that "systematic exclusion cannot be shown by one or two incidents of a particular venire being disproportionate."  *Id*. at 526.

> Here, defendant makes no argument regarding the under-representation of African-Americans in the jury pool, as compared to the community, nor does he assert that there was a systematic exclusion of African-Americans from the jury-selection process.  Instead, the gravamen of defendant's contention is that the trial court should have granted his motion for a change of venue so that he could be tried in a community that did not have a disproportionately low number of African-Americans. However, defendant offers no evidence suggesting that the racial composition of Montcalm County deviated from statistical norms.  Although the impaneled jury did

not contain any African-Americans, it does not necessarily follow that this was based on the composition of the community. Indeed, our requirement that a defendant challenging the racial composition of the jury pool must also show a systematic exclusion suggests that a particular jury venire may not always reflect the composition of the community through no fault of the jury pool selection system. See *Williams, supra* at 525-526. Further, our requirement that a defendant show that more than one or two jury pools were under-represented also suggests that anomalies may occur.

Moreover, defendant cites no authority indicating that the trial court was required, or even authorized, to change venue merely to increase the statistical likelihood of defendant being tried before a jury that included one or more African-Americans. In fact, imposing such a requirement would undoubtedly place an undue burden on the administration of justice. Ultimately, each of the jurors selected for defendant's petit jury indicated that he or she would decide defendant's case impartially; conversely, each of the few potential jurors who expressed any concern about their ability to be impartial were excused. Accordingly, we again conclude that the trial court did not abuse its discretion by denying defendant's motion for a change of venue.

(MCOA Op. at 2-3.)

In its analysis of Petitioner's racial-composition claim, the Michigan Court of Appeals applied the precedent set forth in *Duren v. Missouri*, 439 U.S. 357, 364 (1970), as adopted by the Michigan Supreme Court in *Williams*, 241 Mich. App. at 525-26. The Michigan Court of Appeals properly followed *Duren* in finding that Petitioner did not establish a violation of his Fourteenth Amendment rights because he did not demonstrate an under-representation of African-Americans in the jury pool as compared to the community, nor a systematic exclusion of African-Americans from the jury-selection process. (MCOA Op. at 2-3.) The state court of appeals decision that, "[a]lthough the impaneled jury did not contain any African-Americans, it does not necessarily follow that this was based on the composition of the community . . . a particular jury venire may not always reflect the composition of the community through no fault of the jury pool selection system" was entirely consistent with *Duren*'s requirement that a defendant challenging venue show that his or her jury did

not reflect the actual composition of the community as a result of *systematic* – not random – exclusion

of a distinctive group; and that the fair-cross-section requirement does not mean that petit juries must

mirror the community.   *See Duren*, 439 U.S. at 362-64.   Petitioner only states that he was

"disadvantaged" at trial by the absence of any African-Americans on his jury, and that he should be

re-tried in another county before a jury comprised of some African-Americans. (Pet. Attach. (8)-(14)-

(D), docket #1.)  He neither argues nor shows that the lack of African-Americans on his jury was the

result of their systematic exclusion in Montcalm County.   Accordingly, the Michigan Court of

Appeals properly applied *Duren*.

       I further note that each potential juror was asked at *voir dire* whether Petitioner's race

would make it difficult for him or her to objectively decide the case based on the facts and law

presented at trial.  (*See*, e.g. Tr. I, 41-43, 54, 59, 62, 67, 73, 78, 80, 86, 91-93.)  The two individuals

that indicated they might not be able to be objective based on Petitioner's race were excused; and each

chosen juror stated that Petitioner's race would not influence their verdict.  (Tr I, 55, 62, 67, 109.)

Based on the foregoing, I conclude that  the state court's decision regarding the fair-cross-section

aspect of Petitioner's change of venue claim was not contrary to, or an unreasonable application of,

clearly established Supreme Court precedent.

### F.    Ground V: Denial of Petitioner's motion to suppress his statement to police

       Petitioner claims that the circumstances surrounding his December 17, 1999 recorded

statement to Officer Patino clearly show that he did not make the statement voluntarily.  (Pet. Attach.

(8)-(14)-(E), docket #1.)  He argues that his statement was neither voluntary nor reliable, having been

given: (1) after 15 hours of detention during which time he had no idea he was a homicide suspect;

  
(2) while he was taking Paxil for anxiety and depression;[11] and (3) after detectives told Petitioner's wife about Carla Ringleka's accusations right before Petitioner talked to his wife.  (Pet. Attach. (8)-(14)-(E).)  Petitioner contends that the admission of his statement could not possibly have been "harmless," as it undoubtedly "contributed to the verdict."  (*See* Pet. Attach. (8)-(14)-(E).)

The Michigan Court of Appeals held as follows with regard to this claim:

Defendant also contends that the trial court erred in determining that defendant's statements to the police were voluntary.  Specifically, defendant contends that his confession was involuntary because the police delayed questioning and purportedly used defendant's wife, a court reporter, to coax his confession.

Generally, "statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his Fifth Amendment rights."  *People v. Snider*, 239 Mich App 393, 417; 608 NW2d 502 (2000).  In determining whether a statement was voluntary, the following factors should be considered:

[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention;

---

[11]I note that Petitioner did not raise the anxiety and depression aspect of Ground V in the Michigan Court of Appeals.  (*See* Def.-Appellant's Br. on Appeal, pp. 14-17, docket #21.)  This aspect of Ground V is therefore procedurally barred unless Petitioner can show cause and prejudice for his failure to raise the issue on appeal.  *Nunnemaker*, 501 U.S. at 801; *Engle,* 456 U.S. at 128-29.  Petitioner appears to allege his appellate counsel was ineffective in an attempt to establish cause to excuse his default.  (*See* Pet. Attach. (7)-(14)-(A), docket #1.)  I find, however, that even if appellate counsel had raised the anxiety and depression allegation as a basis for suppression, it would not have succeeded.  *See McFarland*, 356 F.3d at 699.  Petitioner admits that for several hours after his initial detention on December 16, he was unaware that he was a suspect in a homicide.  (*See* Pet. Attach. (8)-(14)-(E).)  As noted by the Michigan Court of Appeals, Petitioner also spent much of his time after arrest sleeping in his cell.  (*See* MCOA Op. 4, docket #21.)  I therefore conclude that this argument would not have succeeded on direct appeal.  *See McFarland*, 356 F.3d at 699.  Because Petitioner has not shown cause for his default on this aspect of Ground V, it is procedurally barred.  *See House*, 126 S. Ct. at 2076; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551.

whether the accused was physically abused; and whether the suspect [sic] was threatened with abuse. [*Id*. at 417-418.]

Although we review de novo a trial court's determination that a statement was voluntary, we "will not reverse the trial court's findings unless they are clearly erroneous." *Id*. at 417.

Here, defendant was a formally educated, thirty-nine-year-old parolee who was repeatedly given *Miranda* [Fn: *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).] warnings, which he waived in writing. Questioning was not repeated or prolonged, and defendant is not contending that he was physically abused or threatened. In fact, defendant indicated within the confession that he "wasn't conjured, coached, or none of that . . . I'm level headed, not drunk, high, or hurt." Although defendant was not questioned until about 19 ½ hours after he was arrested, he was arrested on a separate matter – a parole violation. Moreover, the record indicates that defendant spent most of the time during the delay sleeping in his cell, reducing concerns that his anxiety was overwhelming or that the delay was used to wear down defendant's resistance. Thus, there is no indication that the police used the delay to extract the confession. Further, there is no credible evidence that defendant's wife acted on behalf of police officers to compel defendant to give a statement. In fact, it was defendant who requested to speak with her. Accordingly, there was ample evidence supporting the trial court's determination that defendant's confession was voluntary as a matter of law. Therefore, we conclude that the trial court did not err by denying defendant's motion to suppress his confession.

(MCOA Op. at 3-4, docket #21.) The Michigan Supreme Court denied leave to appeal because it was not persuaded it should review the issue. (*See* Mich. Order, docket #22.)

Under the AEDPA standard, federal habeas courts are no longer authorized to exercise de novo review over the ultimate issue of voluntariness, a mixed question of law and fact. *See Carter v. Johnson*, 110 F.3d 1098, 1108 (5th Cir.), *vacated on other grounds*, 522 U.S. 964 (1997). Instead, the court must respect the judgment of the state court, provided it does not constitute an "unreasonable application" of clearly established federal law as determined by the Supreme Court. Petitioner has failed to show that the decision of the Michigan Court of Appeals on this issue was an unreasonable application of clearly established federal law.

(i)    <u>Right Against Self-Incrimination</u>

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  Even so, "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good . . . . Admissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Texas v. Cobb*, 121 S. Ct. 1335, 1342 (2001) (quotation and citation omitted).  The cases in which a defendant can make a colorable argument that a confession was compelled despite the fact that law enforcement authorities adhered to *Miranda* are rare.  *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (citation omitted).

When a criminal defendant claims that his confession was rendered involuntary by police coercion, the court must inquire whether, considering the totality of the circumstances, the conduct of law enforcement officials overbore the will of the accused. *See Mincey v. Arizona*, 437 U.S. 385 (1978); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). A suspect's state of mind, standing alone, cannot render a statement involuntary. Rather, coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *See Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986).  Typically, findings of coercive police conduct involve brutality or threats of physical coercion. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (threats of physical violence); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant interrogated for eighteen hours without food or sleep while on medication); *Beecher v. Alabama*, 389 U.S. 35 (1967) (gun held to head of wounded suspect to extract confession); *Cooper v. Scroggy*, 845 F.2d 1385 (6th Cir. 1988)

- 54 -

(officer struck defendant, failed to take steps to change coercive environment, and other detective threatened defendant).  Nevertheless, a confession may be rendered involuntary if it is the product of psychological pressure or coercion sufficient to overbear the will of the accused.  *See Fulminante*, 499 U.S. at 287-88.  Among the circumstances to be reviewed by the habeas court are "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition and mental health."  *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (citations omitted).

      (ii)    <u>The State Court Rulings</u>

Petitioner has not argued how, in view of the evidence presented at the July 18, 2000 suppression hearing, the Michigan Court of Appeals ruling that his statement was voluntary was an unreasonable application of Supreme Court precedent.  Instead, Petitioner simply argues that his confession was coerced.  (Pet. Attach. (8)-(14)-(E), docket #1.)  He has not shown how the findings of the trial court were unreasonable in light of the record, *see* 28 U.S.C. § 2254(d)(2), nor could he.  Like the Court of Appeals, I find that the trial court's denial of the motion to suppress is supported by the record on the suppression hearing.  It is undisputed that Petitioner was a 39 year-old parolee who was familiar with jail and police procedure; was read his Miranda rights at least twice; signed a waiver thereof; voluntarily spoke to Patino after he had talked to his wife; had been sleeping in his cell in the hours leading up to his confession; and explicitly stated that he was "level-headed," not high, hurt, or in any way impaired, during his confession.  Under the AEDPA, the factual findings of the state court are entitled to the presumption of correctness, which a petitioner must rebut by clear and convincing evidence.  *Carter*, 110 F.3d at 1109.  Petitioner has failed to offer any evidence that would rebut the findings.  Given the record in this case, he could not possibly do so.  This is not the

- 55 -

rare case in which Petitioner can show that his confession was compelled despite the fact that he waived his *Miranda* rights.  *See Dickerson*, 530 U.S. at 444 (2000).  The state court's decision was not unreasonable on the issue of voluntariness.  Therefore, Petitioner's third ground does not warrant habeas relief.

### G.      Ground VI: Denial of Petitioner's motion to quash the information against him

Petitioner next asserts that the trial court erred when it denied his motion to quash the information against him, which was based on "an improper bind over" because "the evidence presented at the Preliminary Examination was neither credible nor competent." (Pet. Attach. (8)-(14)-(F), docket #1.)  In this ground, Petitioner appears to argue that he was bound over on inadequate evidence.  In support of this ground, Petitioner argues that the testimony of Carla Ringleka and Eric McMurtry at Petitioner's preliminary examination was unreliable and incredible.  (Pet. Attach. (8)-(14)-(F).)  Petitioner claims that Carla's testimony was unreliable because she had made a deal with prosecutors in exchange for her testimony and she was coached by her attorney as she testified.  (Pet. Attach. (8)-(14)-(F).)   Petitioner does not explain why McMurtry's testimony at preliminary examination was unreliable.  He asserts that the examining magistrate "employed an improper standard to bind [Petitioner] over and . . . there was insufficient evidence to support binding [Petitioner] over for trial."  (Pet. Attach. (8)-(14)-(F).)

The Michigan Court of Appeals held as follows on this claim:

> Defendant also contends there was insufficient evidence to bind him over for trial.  We review de novo a circuit court's denial of a defendant's motion to quash to determine if the district court abused its discretion in deciding that there was probable cause to believe that the defendant committed the offense charged.  *People v Reigle*, 223 Mich App 34, 36-37; 566 NW2d 21 (1997).

- 56 -

During defendant's preliminary examination, the victim's wife testified that she and defendant talked about killing the victim, and had unsuccessfully tried to kill the victim during the week before his murder.  Further, she testified that she paid money to defendant to kill the victim.  Thus, there was evidence establishing a conspiracy to murder the victim.  In addition, defendant's friend, who went with him to the victim's house the night of the murder, testified that he heard a physical assault and that defendant told him he had beaten the victim.  While the district court noted that there were questions of fact about whether defendant's friend really knew nothing else about the murder, the district court did not in any way question the veracity of the friend's testimony regarding defendant's involvement.  As such, there was also a sufficient factual basis to support the murder charges.  In light of the evidence introduced at the preliminary examination supporting both charges, we do not believe that the district court's decision to bind over defendant on the charges was an abuse of discretion; therefore, the trial court did not err in denying defendant's motion to quash the information.

(MCOA Op. at 3-4, docket #21.)  The Michigan Supreme Court denied leave because it was not persuaded it should review the issue.  (*See* Mich. Order, docket #22.)

The Michigan Court of Appeals decision that there was sufficient evidence upon which to bind Petitioner over for trial did not run afoul of any United States Supreme Court precedent.  The Supreme Court has held that the federal Constitution does not require that a probable cause hearing be conducted prior to a criminal trial.  *See Gerstein v. Pugh*, 420 U.S. 103, 119, 125 n.26 (1975). A state court's bind-over decision is therefore a state-law issue which does not implicate a federal Constitutional right, and, thus, is not cognizable on habeas corpus review.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Schacks v. Tessmer*, 9 F. App'x 344, 351-52 (6th Cir. 2001) (declining to review state court determination that petitioner's murder conviction rendered bind-over sufficiency of the evidence claim moot ); *Dorchy v. Jones*, 320 F. Supp. 564, 578-79 (E.D. Mich. 2004) (denying habeas relief on petitioner's claim there was insufficient evidence to bind him over for trial). Petitioner is not entitled to habeas relief on Ground VI.

H.      Ground VII: Admission of DNA lab reports

Petitioner argues that his rights to effective assistance of trial counsel, due process, and a fair trial were violated when the trial court admitted the two DNA lab reports that had been provided to Petitioner right before trial and on the second day of trial.  (Pet. Attach. (8)-(14)-(G), docket #1.)  Petitioner points out that while police had the crime scene ax in their possession from December 4, 1999 onward, the DNA testing on the ax did not take place for over nine months – so late that the first trial date had to be adjourned.  (Pet. Attach. (8)-(14)-(G); *see also* 7/19-22/00 Mot. Trs., docket #14.)  He adds that the report suggesting the blood on the ax was Howard Ringleka's was provided two days after the parties' stipulated disclosure deadline.  (*Id*.)  Petitioner asserts that he was denied a fair trial by the admission of the reports because their late disclosure prejudiced him.  (Pet. Attach. (8)-(14)-(G) at 2.)

The Michigan Court of Appeals held as follows with regard to this claim:

Defendant also contends that the trial court erred in admitting DNA lab reports indicating that there was human blood on the ax and that it was the victim's blood. Specifically, defendant contends that the admission of the evidence was an unfair surprise and highly prejudicial because the prosecutor did not provide defendant copies of the lab reports in a timely fashion.  The trial court denied a defense motion to exclude the evidence, finding that there was a reference to the blood on the ax during the preliminary examination.  The trial court opined that the preliminary examination testimony prevented a conclusion that there was undue surprise.

We review a trial court's decisions regarding both the admission of evidence and a determination of an appropriate remedy for a discovery violation for an abuse of that discretion. *People v Adair*, 452 Mich 473, 485; 550 NW2d 515 (1996); *People v Davie (After Remand)*, 225 Mich App 592, 597-598; 571 NW2d 229 (1997).  Here, we agree with the trial court's ruling that the lab reports did not present an undue surprise.  The trial court correctly noted that there was preliminary examination testimony indicating that there appeared to be blood on the ax that was recovered in the victim's driveway.  In light of the victim's wounds and the location of the ax, it is not surprising that the blood on the ax was determined to be human blood or that DNA lab testing indicated that it was the victim's blood.  In addition, to the extent that

- 58 -

the lab reports connected the ax to the victim, instead of connecting the defendant to the ax, they were less prejudicial.  In other words, the prosecutor was still required to introduce evidence linking defendant to the ax in order to obtain a conviction. Accordingly, we do not believe that the trial court abused its discretion by denying defendant's motion to exclude the evidence.

(MCOA Op. at 4-5, docket #21.) The Michigan Supreme Court denied leave because it was not persuaded it should review the issue.  (*See* Mich. Order, docket #22.)

The Michigan Court of Appeals decision on Ground VII was consistent with applicable U.S. Supreme Court precedent.  As an initial matter, an allegation that a state court violated state law regarding admissibility is generally not subject to habeas review in this court: "Errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus."  *Stuart v. Wilson*, 442 F.3d 506, 513 n.3 (6th Cir. 2006) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)).  Only errors of state law regarding evidence admissibility "that result in a denial of fundamental fairness in violation of a petitioner's due process rights" are amenable to habeas review in this court.  *See Stuart*, 442 F.3d at 513 n.3 (citing Walker, 703 F.2d at 962).

The trial court's admission of the two DNA lab reports did not result in a denial of fundamental fairness such that Petitioner's due process rights were violated.  Petitioner's due process rights were maintained when the court admitted the two lab reports, even though Petitioner did not have much time to review the reports before trial.  As noted by the state courts, Petitioner was made well aware that there may have been blood on the ax by testimony at the preliminary examination. Given the head wounds Howard Ringleka suffered, there was no undue surprise that the substance on the ax found to be human blood was in fact Ringleka's.  Although Petitioner bases much of his argument on the months-long delay in testing the ax, he does not offer, nor do I find, any record

- 59 -

evidence showing that the blood on the ax was tampered with, or was not the victim's.  As noted by the Michigan Court of Appeals, this evidence was of minimal prejudicial nature because the prosecution still had to connect the ax to Petitioner.  Because the admission of the two DNA lab reports did not violate Petitioner's due process rights, he is not entitled to habeas relief on Ground VII.

> **I.     Ground VIII: Petitioner's counsel "opened the door" in her closing for the prosecution to imply that two non-testifying witnesses had invoked their Fifth Amendment privilege**

In his final ground for habeas relief, Petitioner argues that his Sixth Amendment right to effective assistance of trial counsel was violated when his trial attorney "opened the door" in her closing argument for the prosecution, in her rebuttal, to imply that two people who did not testify – Eric McMurtry and Jerome Gass  – invoked their Fifth Amendment privilege not to testify.  (Pet. Attach. (8)-(14)-(H), docket #1.)  Petitioner cites to his attorney's statements in closing that, while the prosecution theorized at trial that Petitioner "aided and abetted" two others in killing Howard Ringleka, there was no evidence in support of that theory:

> Where are the individuals that [Petitioner] helped do this crime?  Did you see anybody take the stand and say, [Petitioner] drove me here and he gave me this and he told me the ax was here and he gave me the money.  Where are those people that he helped? Where are those people that he aided and abetted? Did they testify?  Did they even sit in that chair and refuse to testify?  Detective Patino said that they were charged yesterday.
>
> *   *   *
>
> More importantly, what was [Petitioner's] motivation to commit this crime?  They've offered absolutely no motive and that certainly ties in with intent and something you should consider, something the law asks you and tells you, you need to consider.  And where are these individuals that [Petitioner] helped, that he assisted?  How did he do so?  Those people didn't come to testify.  They didn't even come and say, I refuse to testify.

(Pet. Attach. (8)-(14)-(H), citing Tr. III, 65-66, 73, docket #19.)  Petitioner argues that his counsel's reference to the two people Petitioner purportedly helped to kill Howard Ringleka enabled the prosecutor to make the following statements in her rebuttal closing, which prejudiced Petitioner:

> Now Defense again makes a big deal out of the others who were involved and why didn't they come and testify or why didn't they come and say they weren't going to testify.  Well, the Prosecution has an ethical obligation not to call people who we believe are going to invoke their Fifth Amendment right, self-incrimination.  So if I believe they're going to do that, I can't call them.  Now you know that at least one of them has been charged.  That came out in the testimony.  I'm under an ethical obligation not to call these people and the Defense knows that.

(Pet. Attach.(8)-(14)-(H) at 2, citing Tr. III, 77, docket #19.)  Petitioner contends that his trial attorney was ineffective under the Sixth Amendment because she enabled the prosecutor to "infer [sic] during rebuttal argument that Mr. McMurtry and Mr. Gass had invoked their Fifth Amendment privilege" and that "[t]here is no question . . . that this was prejudicial" because it implied that "Mr. McMurtry and Mr. Gass were refusing to testify because they were guilty and therefore [Petitioner] was also guilty."  (Pet. Attach. (8)-(14)-(H) at 2.)  Petitioner apparently maintains that the implication that McMurtry and Gass were guilty necessarily implied that Petitioner was also guilty.

The Michigan Court of Appeals held as follows on this claim:

> Finally, defendant contends that he was deprived of his constitutional right to effective assistance of counsel.  A successful claim of ineffective assistance of counsel requires a defendant to "show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the factfinder would not have convicted the defendant."  *Snider*, supra, at 423-424.  Where, as here, a defendant fails to request a new trial or an evidentiary hearing on this issue, our review is limited to the facts on the record.  *Id*. at 423.

> Specifically, defendant contends that trial counsel erred by "opening the door" for the prosecutor to argue that the "remaining two co-defendants had invoked their Fifth Amendment privilege." [Fn: We question defendant's reference to the two potential witnesses as "co-defendants."  Only one of the witnesses was charged, and

- 61 -

that witness was not charged until the eve of defendant's trial.  Moreover, we note that the prosecutor merely argued that she had an ethical obligation not to attempt to present the testimony of witness [sic] that she believed were "going to invoke" their Fifth Amendment rights.  Thus, contrary to defendant's assertion, the jury was not informed that the two "co-defendants" invoked their right to remain silent.] We are not persuaded, however, that trial counsel's tactics were "deficient."  *Snider, supra* at 423-424.  Although defense counsel's argument may have "invited" the prosecutor to explain the absence of these witnesses, it does not necessarily follow that the jury looked favorably on the prosecutor's explanation.  Moreover, it is certainly customary for trial counsel to question the absence of potential witnesses.  Further, in light of the overwhelming evidence of defendant's guilt, we do not believe that there is a reasonable likelihood that defendant would not have been convicted in the absence of either trial counsel's argument or the prosecutor's explanation.  *Id*.  Consequently, we conclude that defendant was not deprived of his constitutional right to effective assistance of counsel.

(MCOA Op. at 5, docket #21.)  The Michigan Supreme Court denied leave because it was not persuaded it should review this issue.  (*See* Mich. Order, docket #22.)

       In pointing out that its review of this issue was limited by the fact that Petitioner had neither requested a new trial nor an evidentiary hearing on this matter, the Court of Appeals invoked a state procedural basis to bar extensive review.  Notwithstanding Petitioner's default on this issue, however, I will address its merits.  *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

       Petitioner's Ground VIII claim of ineffective trial counsel fails under *Strickland*.  Counsel's performance during closing arguments neither fell below an objective standard of reasonableness, nor did it prejudice Petitioner, resulting in an unreliable or fundamentally unfair outcome.  *See Strickland*, 466 U.S. at 687-88 (1984).  I find that counsel's reference to the non-testifying perpetrators that Petitioner allegedly aided and abetted in killing Howard Ringleka was well within "the wide range of professionally competent assistance." *See id* at 690.  As the Michigan Court

- 62 -

of Appeals noted, it is "customary for trial counsel to question the absence of potential witnesses."
(MCOA Op. at 5, docket #21.) Even if the Court were to find that counsel's performance at closing
was outside that range, Petitioner is not entitled to habeas relief because it is highly unlikely that her
purported "error" at closing had any effect whatsoever on the judgment. *Strickland*, 466 U.S. at 691.
Contrary to Petitioner's argument, it does not necessarily follow that the implication that McMurtry
and Gass were guilty of Ringleka's murder created a corresponding implication that Petitioner was
therefore guilty, as well.  In fact, the opposite inference might have been made, that is, that *because*
McMutry and Gass were guilty, Petitioner was *not* in fact involved in the murder.  For the same
reasons, I find that even if counsel's performance could be deemed "deficient" (it cannot), it did not
prejudice Petitioner, resulting in an unreliable or fundamentally unfair outcome. *See id.* at 688.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition
be denied.

Date:  March 6, 2007                              /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely
objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638
F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).